**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Elias GAITAN–ACEVEDO (95–1616); Paul Free (95–1694); Leonarda Oropeza Arechiga (95–1758); Charles Crehore (95–1764), Defendants–Appellants.**

Nos. 95–1616, 95–1694, 95–1758 and 95–1764.

United States Court of Appeals, Sixth Circuit.

Argued March 12, 1998.

Decided May 12, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 95–1764 June 26, 1998.

Rehearing Denied in No. 95–1694 July 9, 1998.

---

R. Steven Whalen (argued and briefed), Detroit, MI, Nicholas J. Vendittelli (argued and briefed), Dearborn, MI, Joan E. Morgan (argued and briefed), Detroit, MI, Robert A. Ratliff (argued), Cincinnati, OH, Joseph P. Zanglin (briefed), Durant & Durant, Detroit, MI, for Appellants.

Wayne F. Pratt (argued and briefed), Office of the U.S. Attorney, Detroit, MI, for Appellee.

Before: KEITH, SUHRHEINRICH and DAUGHTREY, Circuit Judges.

## OPINION

KEITH, Circuit Judge.

In these consolidated appeals, Defendants, Elias Gaitan–Acevedo, Paul Free, Leonarda Oropeza Arechiga, and Charles Crehore raise various challenges to their respective judgments of conviction and sentences for conspiracy to possess with intent to distribute and distribution of marijuana in violation of 21 U.S.C. § 841(a)(1) and § 846 (1988), and aiding and abetting possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) (1988). For the reasons discussed below, we **AFFIRM** the lower court on all grounds.

### I.

In 1993, a California drug dealer, Richard Sumpter, developed contacts with Roberto Huerta and Miquel Ontiveres, who could provide him with large quantities of marijuana from Mexico. Sumpter, in turn, sold the marijuana to Jerome Maddox in Detroit. Moving the marijuana across an international border and then into Michigan presented logistical problems, however, so Sumpter and his suppliers made arrangements to transfer the marijuana from Mexico to California to Detroit through the Defendants.

Defendant Paul Free frequently coordinated the retrieval of marijuana shipments, delivered numerous shipments received from Huerta in Mexico to Sumpter in California.[1] In July 1993, Free drove a rental truck from San Diego to Detroit to supply Sumpter with 200 pounds of marijuana from Huerta. Sumpter later established a buyer in New York, and in September 1993, Free transported 250 pounds of marijuana from California to New York. Unable to complete the sale in New York, Free then carried the marijuana from New York to Maddox in Detroit, and the sales proceeds back to Sumpter in California.

Free made two deliveries to Detroit in January 1994. On the first occasion, Free transported 400 pounds of marijuana in a motor home to Maddox's "stash house," and returned to California with $350,000 in cash proceeds. On the next occasion, Free delivered 550 pounds of marijuana in a motor home to Detroit, and then flew back to California.

Defendant Charles Crehore worked as a courier for Free, also transporting marijuana from California to Detroit. In December 1993, Free arranged for Crehore to deliver more than 400 pounds of marijuana to Detroit by motor home. One month later, in January 1994, Free had Crehore pick up a motor home Free previously left in Detroit after completing a delivery.

Defendant Elias Gaitan–Acevedo was a manager in the operation. Gaitan–Acevedo coordinated and supervised the shipments of marijuana from California to Detroit. He often participated in trips to retrieve the marijuana from the Arizona desert, and processed marijuana in California to prepare it for distribution in Detroit and other locations throughout the United States.

Defendant Leonarda Oropeza Arechiga, commonly known as "Leah," recruited, trained, and supervised couriers for the syndicate. Oropeza Arechiga received commissions for loads of marijuana that were delivered by the couriers she recruited.

On January 21, 1994, Gaitan–Acevedo and others gave Douglas Shepherd a load of marijuana at the border. After a brief stop in Hemet, California, where he left two duffel bags of marijuana for Gaitan–Acevedo, Shepherd left for Detroit in a motor home to complete the delivery. On January 25, 1994,

---

1. Free facilitated the retrieval of marijuana shipments in the Arizona desert.

law enforcement officers in Illinois stopped Shepherd and discovered 560 pounds of marijuana hidden in duffel bags in the motor home. The officers obtained Shepherd's cooperation, and he continued to Detroit to make a controlled delivery of the marijuana.

While Shepherd was in transit, Sumpter, Curtis Oppedahl, and Defendants Crehore and Gaitan–Acevedo, flew from California to Detroit to meet Shepherd and the shipment of marijuana, and to retrieve the motor home left in Detroit by Defendant Free. Sumpter purchased the airplane tickets for all four of the travelers. When the men arrived in Detroit, they checked into four rooms at the Westin Hotel and waited for Shepherd to arrive. Shepherd and an undercover agent, wearing a monitoring device, went to the Westin Hotel at approximately 12:05 a.m. on January 28, 1994. Gaitan–Acevedo met them in the hotel lobby and escorted them to the room where Sumpter was staying.

After briefly discussing the marijuana shipment that had just arrived from California with Gaitan–Acevedo and Sumpter, Shepherd and the undercover agent left the room, at which time agents from the Drug Enforcement Administration (the "DEA") entered and arrested Sumpter and Gaitan–Acevedo. DEA agents subsequently arrested Crehore in his hotel room, where the agents found marijuana in Crehore's coat pocket and $2,424.60 in cash in a dresser drawer.

Shortly after the arrests in Detroit, law enforcement officers surveilling Sumpter's house in Corondo, California, saw Defendant Free arrive at Sumpter's house, load a suitcase into his pick-up truck, and then drive away. Officers arrested Free as he drove away from the residence. When the arresting officers opened the suitcase, they discovered $60,000 in cash and two semi-automatic handguns.

On October 7, 1994, a grand jury in the Eastern District of Michigan charged 31 defendants, including the four defendants involved in the instant appeal, with one count of conspiracy to distribute and posses with intent to distribute more than 1,000 kilograms of marijuana. A second count

charged Defendants Gaitan–Acevedo, Crehore, and four others with the substantive offense of possession of 100 kilograms or more of marijuana with intent to distribute "on or about January 28, 1994." Several defendants pled guilty to the charges, but at least five of the defendants opted for a trial by jury.

In December of 1994, Defendants Gaitan–Acevedo, Crehore, Free, Oropeza–Arechiga, and Oppedahl went to trial before United States District Judge Horace Gilmore. At the conclusion of the eight-week trial, Gaitan–Acevedo was convicted on both the conspiracy charge and the substantive charge; Free and Oropeza–Arechiga were convicted on the conspiracy charge; and Crehore was convicted on the conspiracy charge, but acquitted on the substantive charge. Oppedahl was acquitted on both the conspiracy charge and the substantive charge.

The district court imposed the following sentences: Gaitan–Acevedo received concurrent 180–month prison terms on Counts One and Two; Free received a term of life imprisonment on Count One; Oropeza–Arechiga received a 121–month sentence on Count One; and Crehore received a 240–month prison term on Count One. The defendants have combined their timely appeals, and raise a combined total of nineteen issues that will be addressed in turn below.[2]

## II.

### A. Defendant Crehore's Claims

#### 1. Suppression of Evidence

■ At trial, Crehore moved to suppress evidence seized during the DEA's search of his hotel room incident to his arrest. The district court concluded that exigent circumstances justified the warrantless entry into Crehore's hotel room and the subsequent search incident to arrest, because the officers held a legitimate concern for Crehore's flight or destruction of evidence. Crehore urges no exigent circumstances existed, and that the district court's refusal to suppress the evidence was in error.

2. Pursuant to Fed. R.App. P. 28(i), Defendants Crehore, Oropeza Arechiga, and Gaitan–Acevedo summarily adopt all issues not raised in their Briefs, but raised by their co-defendants.

■ The lower court's legal conclusions with respect to exigency are reviewed *de novo*, but the court's factual findings on the existence of exigent circumstances may only be disturbed where the findings are clearly erroneous. *United States v. Johnson*, 9 F.3d 506, 508 (6th Cir.1993), *cert. denied*, 512 U.S. 1212, 114 S.Ct. 2690, 129 L.Ed.2d 821 (1994).

■ As a general rule, law enforcement officers may not enter an individual's dwelling without a warrant to effect an arrest or search, absent exigent circumstances. *United States v. Johnson*, 9 F.3d 506, 508 (6th Cir.1993).[3] This Circuit has adopted a two-pronged test to determine when the possibility of the destruction of evidence might constitute exigent circumstances sufficient to justify a warrantless entry into a home. "Warrantless entry to prevent the destruction of evidence 'is justified if the government demonstrates: (1) a reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that the loss or destruction of evidence is imminent.'" *United States v. Straughter*, 950 F.2d 1223, 1230 (6th Cir.1991); *see also United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir.1996) (warrantless entry "to prevent a suspect's escape" is also permissible if supported by probable cause).[4] The district court made several factual findings that clearly support both prongs of our test.

Crehore's connection to the conspiracy was well established. Following Shepherd's arrest in Illinois, DEA agents were aware that Shepherd was traveling to Detroit to deliver marijuana to Sumpter. Through surveillance, officers established that Crehore, Sumpter, and two others boarded a plane together in San Diego, arrived in Detroit together, spoke with one another at the airport, and took a cab together to the Westin Hotel in downtown Detroit, where agents observed the four men check into the hotel together. Agents also knew which rooms the four men reserved.

■ Through the use of a surveillance device worn by the undercover agent, officers heard the defendants discuss the marijuana shipment with Shepherd. While in Sumpter's room, the undercover agent also observed Sumpter speaking to someone named "Charles" on the in-house phone about his plans for the shipment.[5] When arresting officers knocked on the door and entered Sumpter's room to effectuate the arrest, they observed Sumpter talking on the cellular phone and subsequently drop the phone to the ground upon seeing the agents. The phone line remained open during this time. The officers, believing that whoever was on the other end of the line heard the defendants being arrested, and that the listener would be tipped off to the threat of discovery, immediately decided to arrest Crehore in his room. Agents arrived at Crehore's room within two to eight minutes. Upon entering his room, they arrested Crehore and conducted a search incident to the arrest. These findings sufficiently support the district court's conclusion that exigent circumstances existed.

It was not unreasonable for officers to believe Sumpter's companions, who had not yet been arrested, would have been alerted of the arrests through the open phone line, and imminently would have destroyed the

---

3. The Fourth Amendment protection against the warrantless entry and search of a dwelling has also been extended to include hotel rooms. *See Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966).

4. Essentially, the government bears the burden of demonstrating officers had probable cause to believe an imminent threat of the destruction of evidence existed. *Straughter*, 950 F.2d at 1230. Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Padro*, 52 F.3d 120, 122–23 (6th Cir.1995).

5. The officers subsequently learned Sumpter was actually on the phone with Paul Free, not Charles Crehore. This evidence does not affect our determinations, however, because a finding of probable cause is not based upon the arresting officers' actual knowledge, but upon their "reasonable belief" under the circumstances. *Straughter*, 950 F.2d at 1230. Based on the fact that Sumpter initially spoke to "Charles" on the in-house phone line, and told him he would call him "later," the officers were reasonable to believe Sumpter was talking to someone staying in the hotel, and that he was subsequently on the phone with that same occupant when officers re-entered Sumpter's room to make the arrest.

evidence or fled the hotel. Accordingly, the DEA agents were entirely justified under exigent circumstances to immediately enter and seize the evidence upon Crehore's arrest was not clearly erroneous.

### 2. Sufficiency of Evidence

 Crehore also attacks the sufficiency of the evidence supporting his conviction for conspiracy to possess marijuana with intent to distribute. Our review for the sufficiency of trial evidence is limited. *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir.1992). Viewing the evidence in the light most favorable to the government, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). "To sustain a conviction under [§ 846] the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy." *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990).

Crehore admits transporting marijuana for other members of the conspiracy but claims he had no knowledge of or intent to participate in the charged conspiracy. Crehore contends he was merely a part of a smaller distinct transportation conspiracy involving Sumpter, Free and Yvette Duran. Given the overwhelming evidence of Crehore's involvement we are inclined to disagree.

 While drug conspiracies may often be divided into several sub-agreements, separate agreements do not preclude the existence of one substantive conspiracy. *United States v. Ghazaleh*, 58 F.3d 240, 245 (6th Cir.1995), *cert. denied*, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 669 (1996). The key to establishing whether distinct sub-agreements are encompassed within one single conspiracy, "is to determine whether the different sub-groups are acting in furtherance of one overarching plan." *Id.*

The instant conspiracy involved the shipment of large loads of marijuana from Arizona through California to Detroit, and other distribution points. Sumpter, being the hub of the conspiracy, utilized his managers and couriers, including Crehore, Free, and Yvette Duran, to transport the drugs in motor homes and rental trucks. Crehore's participation, however, was not limited to courier activity. In addition to transporting drugs for Sumpter, Crehore delivered bundles of marijuana for Gaitan–Acevedo in December 1993, and in January 1994, retrieved a motor home used by Free in a previous delivery. On the eve of his arrest, Crehore flew to Detroit with Defendants Sumpter and Gaitan–Acevedo, and rode with them in a cab from the airport to the Westin Hotel in Detroit. At the hotel, Crehore waited with the defendants for Shepherd's arrival, discussed the shipment, and agreed to carry the bundles back to California for additional compensation. Thus, Crehore's knowledge of the conspiracy and his involvement with key conspirators is evident.

 The defendant need not have had knowledge of every phase of the conspiracy to have intended to facilitate the common scheme. *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir.1990). It is sufficient that Crehore knew his criminal conduct was connected in some way to the success of the collective venture. *Ghazaleh*, 58 F.3d at 245. Based on the evidence, we find no reason to reject such a finding by the district court.

### 3. Inconsistent Verdict

 Crehore also claims his conviction on the conspiracy charge under Count I is inconsistent with his acquittal on the substantive drug charge in Count II. Assuming Crehore's argument is valid, "inconsistent verdicts provide no basis for reversal," and thus we are precluded from reviewing his conviction on this ground. *United States v. LeMaster*, 54 F.3d 1224, 1233 (6th Cir.1995), *cert. denied*, 516 U.S. 1043, 116 S.Ct. 701, 133 L.Ed.2d 657 (1996); *accord United States v. Powell*, 469 U.S. 57, 67–69, 105 S.Ct. 471, 478–79, 83 L.Ed.2d 461 (1984).

### 4. Admission of Marijuana Evidence

 Crehore challenges the district court's reliance on Agent Mark Thomas' testimony to admit the marijuana evidence

found in Crehore's coat in the hotel room as a violation of his due process rights. This challenge is meritless, however, because the defendant stipulated to Government's Exhibit 4(b), which identified the found substance as 3.0 grams of marijuana. Absent an abuse of discretion, which does not exist given the defendant's stipulation, the district court's admission of evidence is affirmed. *United States v. Bonds,* 12 F.3d 540, 554 (6th Cir. 1993).

## B. Defendant Free's Claims

### 1. Testimony Regarding Witness' Fear

■ Defendant Free first asserts the district court's refusal to grant a mistrial was in err. At trial the government offered testimony from co-conspirator Sumpter against the other defendants. In response to character attacks by defense counsel on cross examination, the government questioned Sumpter on the "downside" of his plea agreement and cooperation with them. Sumpter replied that he and his wife would be killed by the organization if they returned to Mexico, which Free contends was prejudicial.[6]

■ In examining a decision to admit evidence of other acts pursuant to Rule 404(b), we conduct a three-part analysis: first, we review for clear error the district court's factual determination that the "other ... acts" occurred; second, we review *de novo* the district court's legal determination that it admitted the evidence for a legitimate purpose; and third, we review for abuse of discretion the district court's determination that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *United States v. Myers,* 123 F.3d 350, 362–63 (6th Cir.1997).

To address the initial thread of our test, several witnesses testified consistently with Sumpter's assertions about threats from the crime families. The witnesses' testimony reaffirms the conclusion that the threat actually occurred. Secondly, evidence of this type of threat made during the course of a conspiracy to keep co-conspirators from talk-

ing with authorities is relevant to the witness' credibility. *United States v. Santiago,* 46 F.3d 885, 890 (9th Cir.1995).

With respect to the final consideration, defense counsel initiated the attacks on Sumpter's credibility, and thereafter asked Sumpter to identify the parties making the threats to avoid prejudicing the jury. The defendants cannot now claim that Sumpter's response to their inquiry and character attacks was prejudicial. *United States v. Mitchell,* 556 F.2d 371, 379 (6th Cir.1977). We find no abuse by the district court in admitting Sumpter's testimony.

### 2. Admission of Summary Exhibit

■ Free also challenges the district court's admission of an 11–page summary exhibit, exhibit 41(b), depicting the results of an analysis of voluminous telephone toll records as an abuse of discretion. He asserts that the investigating agent, Agent Bowler failed to present sufficient foundation to authenticate the exhibit, and that it was inaccurate and hearsay evidence.

■ Summary evidence may be introduced under Fed.R.Evid. 1006 as non-evidentiary aid for "the jury in the examination of testimony or documents in evidence." *United States v. Paulino,* 935 F.2d 739, 753 (6th Cir.1991). Federal Rule of Evidence 1006 provides that the "contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Rule 1006 commits the admissibility of such materials "to the sound discretion of the trial judge," which may be reviewed only for abuse of that discretion. *Paulino,* 935 F.2d at 753.

We find no evidence of abuse in this case. At trial, agent Bowler explained to the district court's satisfaction, his method of loading and compiling the information from computer toll records into the summary exhibit. *United States v. Paulino,* 935 F.2d 739, 753 (6th Cir.1991). The information summarized in the exhibit consistently reflects the evi-

---

**6.** When asked to clarify which group would kill him and his wife, Sumpter identified "Roberto Huerta's and Miquel's group." Upon further prodding, Sumpter identified Free as a member of "Miquel's group."

dence presented to the jury. While district courts are generally instructed to issue cautionary instructions to remind the jury of the exhibit's non-evidentiary value, *see United States v. Campbell*, 845 F.2d 1374, 1381 (6th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 248 (1988), we have not held a court's failure to issue such instructions fatal where "the defendants had a full opportunity to cross-examine the witness and thereby 'alleviat[e] any danger of inaccuracy or unfair characterization.'" *Paulino*, 935 F.2d at 753 (citations omitted). We, therefore, conclude this exhibit was properly admitted within the district court's discretion.

### 3. Evidence of Free's Flight

■ Free also contests the district court's admission of evidence that, after he was arrested and released in January of 1994, he fled to Mexico. Evidence of "flight" is generally admissible as evidence of "guilt," and "juries are given the power to determine 'how much weight should be given to such evidence.'" *United States v. Touchstone*, 726 F.2d 1116, 1119 (6th Cir.1984). The district court's admission of evidence concerning Free's flight is subject to review only for abuse of discretion. *United States v. Dillon*, 870 F.2d 1125, 1126 (6th Cir.1989).

■ In the instant case, the record clearly supports a finding of "flight" by Free, consistent with the four factors adopted in *Dillon*. Under *Dillon*, Free's behavior after his release: (1) must suggest "actual" flight, (2) due to a "consciousness of guilt," (3) based upon the crime charged, (4) and linked to his "actual guilt" for the charged crime. *Id.* at 1127. Free's immediate departure to Mexico after his release, combined with evidence that he possessed $60,000 and two handguns while traveling, confirms that Free understood he was guilty of the more serious offense with which he was charged, instead of a lesser charge that the seized evidence would have warranted. Accordingly, the district court did not abuse its discretion.[7]

### 4. Robert Lillie's Fifth Amendment Right

■ Co–Defendant Robert Lillie entered a guilty plea on January 30, 1995. Free contends the district court abused its discretion by allowing Lillie to refuse to testify by invoking his Fifth Amendment right against self-incrimination when Free attempted to call Lillie as a defense witness the following day. On February 1, 1995, the district court heard arguments from all affected parties and ruled that Lillie could properly invoke his Fifth Amendment right in response to Free's demand, because defense counsel's line of questioning could have exposed Lillie to potential prosecution from which he was not protected.

■ A defendant's right to force a witness to testify must yield to that witness' assertion of his Fifth Amendment privilege against self incrimination, where it is "grounded on a reasonable fear of danger of prosecution." *See United States v. Damiano*, 579 F.2d 1001, 1003 (6th Cir.1978); *Brown v. Cain*, 104 F.3d 744, 749 (5th Cir. 1997) ("a witness' right against self-incrimination will outweigh a defendant's right to force that witness to testify."), *cert. denied*, —— U.S. ——, 117 S.Ct. 1489, 137 L.Ed.2d 699 (1997). The trial judge, "necessarily is accorded broad discretion in determining the merits of a claimed [Fifth Amendment] privilege." *United States v. Lyons*, 703 F.2d 815, 818 (5th Cir.1983).

After careful examination, the lower court concluded that Lillie's plea agreement did not protect him from prosecution in any district other than the Eastern District of Michigan. Lillie's testimony, thus could have subjected him to further prosecution in other jurisdictions for crimes committed in Arizona. This "reasonable danger" of prosecution was sufficient to support the court's decision. The district court did not abuse its discretion.

---

7. Free faults the district court for failing to make explicit findings on the four factors set forth in *Dillon*, but fails to note that he only interposed hearsay objections to the evidence of his flight. Had Free lodged a contemporaneous objection based on relevance or the prejudicial effect of the evidence, the district court would have been obligated to make the findings necessary under Fed. R.Evid. 401 through 403. Absent such an objection, the district court was not duty-bound to make the findings.

*5. Newly Discovered Evidence*

■ Free also asserts that the district court erred in denying his motion for a new trial premised upon newly discovered evidence. Specifically, Free argues that a member of the conspiracy, Antonio Diaz, who did not testify at trial, indicated at the end of the trial, after his plea was taken, that the person named "Paul," who went to Arizona to pick up marijuana, was not in fact Defendant Paul Free. On April 6, 1995, the district court held a hearing and denied Free's motion for a new trial.

■ The decision to grant or deny a motion for a new trial based on newly discovered evidence is within the discretion of the trial court, and is reversed only for an abuse of that discretion. *United States v. Glover*, 21 F.3d 133, 138 (6th Cir.1994). A new trial on this ground may not be granted unless: "(1) the new evidence was discovered after the trial; (2) the evidence could not have reasonably been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal." *United States v. Davis*, 15 F.3d 526, 531 (6th Cir.1994) (citations omitted).

In the instant case, it is not evident that defense counsel exercised due diligence to discover Diaz's belief concerning Free. Diaz's existence was well known to all parties before and during trial. In fact, during trial Diaz wrote a letter exculpating another co-defendant—a letter that at least would have put Free on notice that Diaz held information that could have exculpated him as well. Notwithstanding Free's due diligence, the evidence against the defendant was overwhelming. Several co-defendants testified as to Free's involvement with several marijuana deliveries. Thus, Diaz's exculpatory statement was an insufficient basis to grant a new trial because it was not material to Free's conviction, and thus not "likely [to] produce an acquittal." *United States v. White*, 861 F.2d 994, 997–98 (6th Cir.1988). The district court properly denied the motion for a new trial.

**C. Defendant Gaitan–Acevedo's Claim**

■ Gaitan–Acevedo takes issue with the district court's decision to exclude on hearsay grounds a letter from Mexican Consul Attache Federico Moreno Santos, stating that "El Ranchito" was a small Mexican village. In its case-in-chief, the government presented evidence that a telephone/address book seized from Gaitan–Acevedo at the time of his arrest contained the notation "Ranchito." The term "Ranchito" means "small ranch or small home" in Spanish. The government's contention was that some of the defendants, including Gaitan–Acevedo, used drug proceeds to purchase a cattle ranch in Mexico. The defendant wanted to rebut this evidence with the letter. Gaitan–Acevedo asserts that the phone number listed next to Ranchito was actually the number of a public telephone in a small Mexican village. At trial, Gaitan–Acevedo conceded that the letter was hearsay, but argued that the letter should have been admitted under the catch-all exception to the hearsay rule set forth in Fed. R.Evid. 804(b)(5). Although the district court rejected this argument based on its findings, it permitted the defendant to present a stipulation that El Ranchito was the name of a small town in Mexico.

Without addressing each requirement concerning the admissibility of hearsay evidence under the catch-all exception, the letter is inadmissible because it was not "offered as evidence of a material fact" as contemplated by Rule 804(b)(5)(A). *United States v. Canan*, 48 F.3d 954, 959 (6th Cir.1995). The issue at trial was whether Gaitan–Acevedo was engaged in drug distribution. Evidence concerning the defendant's "ranchito" was tangentially related to the central issue in that it established that Gaitan–Acevedo had accumulated wealth, but the existence of a "ranchito" was not a material dispute at trial. Evidence concerning the town of Ranchito in Mexico at most would have called into question the meaning of a single entry in the defendant's notebook—a matter that clearly was not material to the jury's determination of his guilt on the drug charges. We find no reversible error on this ground.

## III.

In addition to the challenges raised individually by each defendant, several of the defendants raise common issues on appeal. These challenges are addressed below.

### A. Juror Misconduct

■ Defendants Gaitan–Acevedo, Oropeza–Arechiga and Free challenge the district court's refusal to grant a mistrial based upon juror misconduct. They identify two alleged instances of misconduct. The first incident involved the juror foreperson, a high school teacher, who disclosed that he had terminated a scheduled trip with his students because he apprehended three of the students using marijuana. The defendants moved for the juror's removal. In response, the district court questioned the juror about his ability to render a fair verdict, but ultimately denied the motion based on its determination that the juror could render such a verdict. The second incident occurred two days later. The government advised the court that they had overheard the jurors discussing the case and commenting on the credibility of witnesses and guilt of defendants. The district court conducted a voir dire of the 16 jurors, discharged the juror that made disparaging comments, and gave the remaining jurors a series of cautionary instructions.[8]

■ It is well established that "[t]he trial judge is in the best position to determine the nature of the alleged jury misconduct," and the "appropriate remedies for any demonstrated misconduct." *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir.1995), *cert. denied*, 516 U.S. 874, 116 S.Ct. 199, 133 L.Ed.2d 133 (1995). The lower court's decision will be upheld absent an abuse of discretion. *Id.*

Contrary to Defendants' contention, the district court's rulings were not erroneous. In both instances, the court investigated the reported misconduct, examined the jurors to · determine which of them could render a fair and impartial verdict, gave the appropriate cautionary instructions, and dismissed the juror believed to be undermined. In the first instance, the court examined the juror that discovered his students smoking marijuana, and asked if he thought the incident with his students "would in any way affect [his] ability to sit as a fair juror," to which the juror replied that he did not. The Defendants assert that this juror somehow experienced a "traumatic event" with his students, such that his "emotional involvement" with the event prevented him from fairly and impartially returning to a trial involving the same controlled substance. This argument is not persuasive. In response to the district court's voir dire, the juror adequately demonstrated an ability to make the appropriate distinction and did not appear to be biased in any way toward the defendants. Accordingly, the district court was justified in giving cautionary instructions and retaining the juror for the remainder of the trial.

■ The second instance, however, was more involved, and requires more consideration. There is evidence from the record that the jurors as a whole had been inattentive to the trial court's instruction not to discuss any part of the case. Jurors admitted commenting on the number of cars one of the defendants owned, the government's style of witness examination, and joked about "convict[ing] them all" so that they could go home. Nonetheless, these comments alone do not evidence "actual" bias. *United States v. Pennell*, 737 F.2d 521 (6th Cir.1984) (noting that actual bias may not be presumed). Absent additional evidence, whether concrete or circumstantial, and assuming the district court was in the best position to assess the significance of the jurors' comments, we cannot accept the defendants' speculation about juror statements

---

8. Juror Lipinski, who had been identified as the one discussing the case, acknowledged making the comments to juror 3, who was sitting next to her, and was dismissed. Juror 3 explained that she responded to Lipinski's remarks with "Yeah" or "Uh-huh," so Lipinski "would be quiet," but that they had no effect on her. Juror 3 was not excused at that time, but was later excused from the jury so that she could attend a meeting. The remaining jurors stated they did not hear Lipinski's comments, or that they could not understand what was said, and consequently were not dismissed.

as proof of impartiality.[9] *Id.* at 532. The district court determined that the majority of the comments were minor and not prejudicial, except those by Ms. Lipinski, whom the court removed. It also admonished each of the remaining jurors individually. Thus, the district court's rulings were appropriate based on its findings, and provide no basis for reversal. *See Copeland,* 51 F.3d at 613–14 (opining that no abuse of discretion exists where the district court "investigated the merits of the charge and rendered the appropriate cautionary instructions.").

## B. Co-conspirator Statements

■ Defendants Gaitan–Acevedo and Free contend that the trial court erred in admitting documents seized from Georgette Tomsick upon her arrest, because the documents were hearsay evidence not within the co-conspirator exception.[10]

■ The lower court's decision to admit evidence over a hearsay objection is reviewed *de novo. United States v. Fountain,* 2 F.3d 656, 668 (6th Cir.), *cert. denied,* 510 U.S. 1014, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993). Upon plenary review we find no error by the district court. At the time of Tomsick's arrest, officers seized several documents from her, including papers and an address book, containing written telephone numbers, addresses and the names of several defendants. At trial, the district court admitted the documents, concluding that the documents were not hearsay, and if they were, they fell within the hearsay exception.

■ The evidence was clearly admissible as non-hearsay, not subject to the co-conspirator exception under Fed.R.Evid. 801(d). The government offered the numbers and addresses to demonstrate, in conjunction with other evidence, that members of the

conspiracy associated with each other for business purposes. The defendants' contention that the evidence was offered as true and accurate numbers by which to reach co-conspirators was not supported by the record. Personal telephone directories and notebooks are admissible as "drug records" for non-hearsay purposes of showing that a conspiracy existed and that a defendant was a member of the conspiracy. *United States v. Nava–Salazar,* 30 F.3d 788, 798 (7th Cir. 1994). These documents are not offered to prove the information they contained and therefore, may not be excluded as hearsay. The documents were properly admitted by the district court.

## ·C. Evidence of Prior Criminal Misconduct

■ Defendants Free and Crehore argue that the district court erred in admitting evidence of misconduct that they committed above and beyond the crimes charged in the indictment. The decision whether to admit prior convictions for impeachment is committed to the discretion of the district court, *United States v. Meyers,* 952 F.2d 914, 916 (6th Cir.), *cert. denied,* 503 U.S. 994, 112 S.Ct. 1695, 118 L.Ed.2d 407 (1992), and is reviewed only for an abuse of that discretion. *United States v. Cooper,* 577 F.2d 1079 (6th Cir.1978).

■ The district court did not abuse its discretion with respect to the evidence concerning Crehore's prior drug conviction. Crehore's prior conviction was admissible as impeachment evidence under Fed.R.Evid. 609(a). Prior to trial, the defendant filed two motions in limine, seeking to exclude evidence of his prior conviction under both Fed. R.Evid. 404(b) and 609. The district court held the Rule 404(b) ruling in abeyance until

9. Defendants also urge that it can be conclusively presumed that the jury was not impartial, under *Smith v. Phillips,* 455 U.S. 209, 223, 102 S.Ct. 940, 949, 71 L.Ed.2d 78, 90. This presumption, however, is applicable only in extreme instances of juror bias, such as "revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Id.* at 222,

102 S.Ct. at 948. The instant case does not present a level of egregiousness warranting this presumption.

10. Georgette Tomsick, a charged co-conspirator, was arrested on July 10, 1994, in Arizona while driving a motor home containing eight army duffle bags filled with marijuana. This occurred six months after Sumpter and many of the defendants had been arrested and taken into custody.

the government sought to admit the evidence, but held that Crehore could be impeached with the conviction under Rule 609 if he elected to testify. During the course of his testimony on direct examination, Crehore voluntarily introduced the fact that he had been convicted on a drug charge in 1985. The trial court permitted limited cross-examination on the prior conviction by the government, and admonished the jury to consider the prior conviction only for impeachment purposes.[11] Evidence admitted during the government's line of questioning, given the precautions taken by the lower court to avoid any possible prejudice, was proper. *Meyers*, 952 F.2d at 916 ("For purposes of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness . . ."). Despite its admissibility, the defendant is otherwise precluded from challenging the admission of his prior conviction because he voluntarily introduced the fact on direct examination. *United States v. Ramos*, 861 F.2d 461, 468–69 (6th Cir.1988) (having opened a up a subject, despite its limited relevance, a party cannot complain on appeal if his opponent pursues the issue).

■ Free challenges the lower court's admission of evidence that he previously faced drug charges in an unrelated case as an abuse of discretion under Fed.R.Evid. 404(b). After his release in January 1994, Free made several telephone calls from Mexico to Diana Sumpter, wife of Richard Sumpter, who by then was cooperating with the government. In one of the telephone conversations, Free suggested Richard Sumpter, his co-defendant, go to trial immediately, and made reference to some "thing" in his past where he "fought for 18 months," but a "guy" got caught with an ounce of pot and "screwed everything up." Through Diana's assistance, the government taped this conversation and offered the conversation as evidence at trial.

Prior to trial, the district court denied Free's motion in limine to strike the conversation, concluding the tape "[did not] say he got convicted," and thus presented no Rule 404(b) issue. Assuming the taped conversation presents evidence of a prior criminal act, the evidence is nonetheless admissible under Rule 404 to demonstrate Free's knowledge of the conspiracy, and not his prior misconduct. *United States v. Ailstock*, 546 F.2d 1285, 1289 (6th Cir.1976) (holding that evidence of prior criminal misconduct is admissible under Rule 404(b) to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident); Fed. R.Evid. 404(b).

It is not clear whether the district court balanced the prejudicial effects with the probative value of the conversation in accordance with Fed.R.Evid. 403. However, given the vagueness of the references made in the conversation, combined with the lower court's specific instruction that the jury not consider misconduct not included in the indictment, any prejudicial effect was minimized. Accordingly, we find no reversible error.

### D. Prosecutorial Misconduct

■ Defendants Gaitan–Acevedo and Oropeza Arechiga allege that the eight-week trial was infected with prosecutorial misconduct. The defendants specifically challenge the rebuttal portion of the government's closing argument. We review the denial of a motion for mistrial for an abuse of discretion. *United States v. Atisha*, 804 F.2d 920, 926 (6th Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). "[A] determination of the fairness to the accused is the primary concern in ruling upon a mistrial motion. . . ." *Id.* Whether the government's closing argument amounted to prosecutorial misconduct and whether the argument rendered the trial "fundamentally unfair" are mixed questions of law and fact, that are reviewed *de novo*. *Pullman– Standard v. Swint*, 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

During his closing argument, Oropeza- Arechiga's defense counsel explained that "all of these defendants" are facing a "mandatory ten-years." Outside the presence of the jury the government objected to this argument. The district court responded,

---

11. Crehore's defense at trial was that he had no knowledge of the shipment of marijuana that arrived in Detroit. He asserted that he was in town to buy electronics equipment.

stating it would correct the statement by instructing the jury that "punishment is none of their business." On rebuttal, the prosecutor paraphrased the court's jury instruction with respect to the "minimum mandatory penalties," and argued that the defendants were asking for sympathy by mentioning the possible penalty. The district court reemphasized the sentencing issue the same day during jury instructions.

In light of the comments initially made by defense counsel, the government's remarks to the jury were not flagrant, misleading or deliberate, such that would constitute misconduct.[12] *United States v. Carroll,* 26 F.3d 1380, 1384–90 (6th Cir.1994). The rebuttal statement was made in response to defense counsel's argument and was merely a restatement of the district court's instruction. Without more, the defendants are not entitled to a new trial.

### IV.

### A. Sentencing Ranges

■ Having affirmed all convictions, we next address the various sentencing issues raised by the defendants. All four defendants challenge the district court's findings on factors supporting their sentencing ranges under the Sentencing Guidelines. The district court's findings are reviewed for clear error. *United States v. Welch,* 97 F.3d 142, 152 (6th Cir.1996) (applying standard to role of offense findings); *United States v. Walton,* 908 F.2d 1289, 1300–01 (6th Cir.1990) (applying to quantity of drugs findings).

### 1. Sentence Calculations for Crehore

■ On appeal, Crehore admits the conspiracy involved over 1,000 kilograms of marijuana, but challenges the district court's findings with respect to the amount of marijuana attributed to him. More specifically, Crehore asserts that only 500 pounds of marijuana, the load from the December 1993 delivery, should be attributed to him.

■ At sentencing, the district court found Crehore responsible for 500 pounds of marijuana, for the December 22, 1993 load; 500 pounds for the January 10, 1994 load; 500 pounds for the January 23, 1994 load; 605 pounds for the January 25, 1994 load; and 500 pounds for the June 1994 load.[13] For sentencing purposes, the government must prove by a preponderance of the evidence the amount of drugs directly attributable to the defendant and "all reasonably foreseeable acts and omissions of others in furtherance of the" conspiracy. U.S.S.G. § 1B1.3(a)(1)(B) (1997); *United States v. Gessa,* 57 F.3d 493, 496 (6th Cir.1995). The district court must ensure that "the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which [he] is being held responsible," erring on the side of caution. *United States v. Walton,* 908 F.2d 1289, 1302 (6th Cir.1990). Furthermore, the district court must make specific findings and "explicitly set forth the evidence on which it relies." *United States v. Baro,* 15 F.3d 563, 569 (6th Cir.1994).

Upon careful examination, the record and evidence adequately support the specific and detailed findings of the district court. Crehore was clearly responsible for the December 22, 1993 load, because he was the driver of the rental truck from California to Detroit when Free became unavailable. Crehore also drove the empty motor home back to California following the January 23, 1994 delivery and may be held responsible for his involvement in that delivery. In light of his extensive contact and association with coconspirators, Crehore's involvement with the conspiracy at the time of the remaining deliveries is evident. These deliveries were all reasonably foreseeable, and thus may also be

---

**12.** Gaitan–Acevedo further contends the government's remarks during closing arguments were misleading and prejudicial. In addition to the comments with respect to minimum sentencing, he challenges the government's characterization of Gigi Tomsick's arrest and statements concerning "El Ranchito." The argument is groundless, however, because the evidence clearly supports all inferences and arguments made by the government during its closing remarks.

**13.** The 605 pounds of marijuana constitutes the 500 pound load discovered with Shepherd in Illinois, plus two duffle bags containing 105 pounds of marijuana, to which Crehore agreed to pick up in Detroit and return to California.

attributed to Crehore. Crehore's arrest does not negate any liability attributed to him for the June 1994 load. Based on the taped conversation between Diane Sumpter and Free, and Crehore's pattern of contemporaneous calls to Free after his release on bond, it is also apparent that he continued to be involved with the conspiracy even after his arrest. We find no error for any of the findings by the district court.

### 2. Crehore's Sentence Enhancement

 Crehore also challenges the mandatory minimum twenty-year sentence imposed by the district court given the limitations outlined in 21 U.S.C. § 851. Section 841(b)(1)(A) prescribes a ten-year term of imprisonment for first time drug offenders who possess with intent to distribute 100 kilograms of marijuana. The mandatory minimum sentence, however, is doubled to twenty years where the offender "commits such a violation after a prior conviction for a felony drug offense has become final." Crehore concedes that he has a qualifying prior conviction for a felony drug offense, but contends that the language of section 851(a)(2) prohibited the district court from imposing the enhanced sentence in this case.

As a precondition to application of the enhanced statutory minimum prescribed under section 841(b)(1)(A), the government is required to file a pre-trial information stating "the previous convictions to be relied upon," in accordance with section 851(a)(1). The information may not be filed, however, if "the increased punishment which may be imposed is punishment for a term in excess of three years unless the person either waived or was afforded prosecution by *indictment* for the offense for which such increased punishment may be imposed." § 851(a)(2) (emphasis added).

At issue in the case at bar is whether the phrase, "the offense for which such increased punishment may be imposed," is a reference to the instant offense charged or a reference to the offense of the prior conviction. Crehore's sentence was enhanced under a nine year old drug offense from the state of California. He was charged in California by information, and there is no evidence that he

waived his right to indictment. The information resulted in a 21–day suspended sentence. Crehore argues the condition applies to the prior offense, on which he was charged by information, and that consequently, the government was precluded from filing the information for an enhancement in the instant case. Although this Circuit has not addressed this issue, and all of circuits that have examined § 851(a)(2) reject Crehore's interpretation.

Six circuits have interpreted the "indictment or waiver" phrase to refer to the federal offense for which the mandatory sentence is imposed. *United States v. Ortiz*, 143 F.3d 728, 732–33 (2nd Cir.1998); *United States v. Harden*, 37 F.3d 595, 599–600 (11th Cir. 1994); *United States v. Trevino–Rodriquez*, 994 F.2d 533, 536 (8th Cir.1993); *United States v. Burrell*, 963 F.2d 976, 992–93 (7th Cir.), *cert. denied*, 506 U.S. 928, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992); *United States v. Adams*, 914 F.2d 1404, 1406–07 (10th Cir.), *cert. denied*, 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990); *United States v. Espinosa*, 827 F.2d 604, 616–17 (9th Cir.1987). These opinions all reach the conclusion that the federal offense is the one that must be prosecuted by indictment to trigger the enhanced mandatory minimum penalty. We do not interpret the statute to the contrary. The district court's sentencing decision is affirmed.

### 3. Oropeza Arechiga's Sentence

 Oropeza Arechiga also challenges the amount of marijuana attributed to her, and contends she was entitled to a downward adjustment based on her minimal involvement with the conspiracy. The district court held the defendant responsible for all five loads transported by Shepherd, constituting 1000 to 3000 kilograms of marijuana. The court reasoned that because Oropeza Arechiga recruited Shepherd, all of his deliveries were reasonably foreseeable. Based on the overwhelming evidence of the defendant's involvement and the reasonable foreseeability that her recruits would continue to drive for the conspiracy, we find no clear error by the lower court.

Moreover, Oropeza Arechiga's role in the conspiracy clearly was not limited such that she was entitled to a four point reduction under U.S.S.G. § 3B1.2. Under the sentencing guidelines, a minimal participant is someone who played a single, limited role in the conspiracy. *United States v. Williams*, 940 F.2d 176, 180 (6th Cir.1991). The district court, considering the testimony and evidence presented at trial, rejected arguments that the defendant's role was minor. We find no evidence to the contrary. Oropeza Arechiga's sentence is affirmed.

### 4. Free's Sentence

The district court, using extremely conservative estimates for the size of the loads, held Free responsible for eleven instances of drug trafficking, involving 1,756 kilograms of marijuana. In addition to these determinations, the district court found Free to be a principal supervisor within the conspiracy and a career drug offender. Free initially qualified for an offense level 32, triggering the statutory mandatory minimum sentence of life imprisonment. The district court, however, enhanced Free's sentence three levels for his supervisory role in the conspiracy, and two levels for obstruction of justice. On appeal, Free challenges the amount of marijuana attributed to him, the sentence enhancements, the credibility of co-defendants Shepherd and Sumpter's testimony, and the applicable standard by which the lower court based its findings.

With respect to the applicable standard for sentencing purposes, the district court was correct to apply a "preponderance of the evidence" standard to its findings. *United States v. Hodges*, 935 F.2d 766 (6th Cir.), *cert. denied*, 502 U.S. 889, 112 S.Ct. 251, 116 L.Ed.2d 206 (1991).

Free's challenge to the district court's findings are equally unpersuasive. The district court made specific findings with respect to all loads attributed to Free from his presentencing report. The evidence at trial linked Free to the leaders and organizers of the drug organization. Sumpter and Shepherd testified to several occasions in which Free either supervised or accompanied them to pick up loads from Arizona. The district court credited this testimony in making its determinations. Given the overwhelming evidence of Free's supervisory role in the conspiracy, the district court was not erroneous to accept this testimony or attribute responsibility to the defendant on all loads.

Finally, we need not consider whether the lower court erred in applying the sentence enhancements, because they had no impact on Free's sentence. The statutory minimum sentence imposed life imprisonment. Application of the two level and three level enhancements could impose no greater penalty than life imprisonment. We find no reason to reverse.

### 5. Gaitan–Acevedo's Sentence Enhancement

Gaitan–Acevedo argues that the district court erroneously imposed a three-point enhancement pursuant to U.S.S.G. § 3B1.1, to his sentence for being an organizer, manager or supervisor of the conspiracy. At sentencing, the district court found the following:

> Now, I think the investigation reveals that [Gaitan–Acevedo] was the supervisor distributor within the United States. I think his role was to assure the loads were brought into the Organ Pipe Cactus National Monument to be picked up in motor homes; that he arranged often for drivers to be sent to pick up the marijuana; the motor homes were maintained so the loads could be delivered; the Marijuana repackaged, and the loads made their final destination point. He supervised the drivers Doug Shepherd and Georgette Tomsick in the picking up and delivering of the Marijuana. He made—and to show his participation, for example, when one motor home broke down in Elko, Nevada, that he was called by Doug Shepherd, and Doug—and he forwarded money to Doug Shepherd so that he could go on his way.

J.App. at 936–37.

The defendant objects to this finding because he contends he did not directly employ or control his coconspirators. Evidence of direct control or ultimate decision-making authority, however, is not required for lead-

ership enhancement. *United States v. Schultz,* 14 F.3d 1093, 1099 (6th Cir.1994). "The central concern of § 3B1.1 is relative responsibility." *United States v. Gibson,* 985 F.2d 860, 867 (6th Cir.), *cert. denied,* 508 U.S. 979, 113 S.Ct. 2981, 125 L.Ed.2d 678 (1993). We find such responsibility on the defendant's part.

Gaitan–Acevedo was responsible for processing all marijuana in California. He gave Shepherd directions as to where the Yakima, Washington delivery was to be made. He made all necessary arrangements for Shepherd when the motor home broke down in Elko, Nevada. Gigi Tomsick, another driver, had the defendant's telephone number as her contact person, when she was arrested with a load of marijuana. These findings clearly evidence Gaitan–Acevedo's level of responsibility, and support the sentence enhancement imposed by the district court. Gaitan–Acevedo's sentence is affirmed.

## V.

For the foregoing reasons, the decision of the Honorable Horace W. Gilmore of the United States District Court for the Eastern District of Michigan is **AFFIRMED**.