NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0122n.06

Case No. 24-5697

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Mar 10, 2026

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DENICO N. HUDSON, | ) | KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: SUTTON, Chief Judge; GRIFFIN and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Denico Hudson sold machinegun conversion devices—known as Glock switches—to his fellow gang members. Unsurprisingly, those gang members used their modified guns to shoot their rivals and traffic drugs. So a district court sentenced Hudson to 108 months' imprisonment after applying enhancements that reflected Hudson's role in this gangland chaos. Now Hudson challenges two of those enhancements pertaining to the number of switches sold and the connections between his switch sales and other crimes. He also claims that he should've received a downward adjustment for his culpability level. But because the district court didn't err in sentencing Hudson, we AFFIRM.

## I.

Hudson and his associates, Demarco Sturgeon and Isaiah Smith, sold Glock switches in the Cincinnati area. The operation relied on a vertical distribution chain. Smith manufactured

over 80 devices with a 3D printer. He sold most of those switches to Sturgeon, and sometimes he traded them for Sturgeon's guns. Sturgeon then sold most of his switches to Hudson for cash and drugs. Hudson used Facebook and in-person meetups to sell the switches to end-users. And he referred customers to Sturgeon and facilitated those sales. But Hudson didn't stop at 3D-printed switches. He also hawked the more durable metal variant—an import that commanded a premium. Hudson revealed an entrepreneurial streak, and his apartment became a go-to spot to buy a Glock switch.

This case concerns one-third of the Hudson-Sturgeon-Smith triumvirate. Hudson was a member of the "Button Boys" gang ("button" refers to a selector on the side of a Glock switch). He sold switches to his fellow gang members, who committed a series of shootings. One shooting arose from a botched murder-for-hire in which the intended victim wounded Brian Wright, Hudson's close friend and gang associate. And a string of shootings implicated DeAngelo Knox, another close associate. Hudson's switches helped the Button Boys play defense, too. The gang dealt valuable drugs, and because drug dealers can't rely on the law to protect their wares, switch-equipped guns sent a message to potential marauders. Hudson knew this because he dealt fentanyl, heroin, and crack cocaine. He traded drugs for Sturgeon's switches, and he sometimes sold drugs to his switch customers. He even offered special bundles: pills and switches from a single supplier.

In conducting their business, Hudson and his crew left breadcrumbs for investigators. When the police arrested one of Hudson's associates, they found a pistol with a 3D-printed switch that matched Smith's description of his own product. And there were virtual clues, too. Hudson and Sturgeon flaunted their success on social media. Sturgeon posted photos and videos of switches, guns, and drugs, and Hudson's Facebook doubled as a marketing page. In one post, an

2

advertisement for switches bore the tagline "get in where you fit in."  R.113, Presentence Report, PageID 367.  In another, Hudson grinned as he fanned out a wad of cash.

So Hudson emerged as a suspect when the government connected the dots between Cincinnati-area shootings.  This is no figure of speech:  investigators drew a chart that linked the shootings to individual gang members.  They tied Hudson to several shootings by connecting him to three shooters and to "roughly" seven or eight guns.  R.122, Sent'g Tr., PageID 519.  The government also recruited a confidential informant to learn more about the Button Boys.  The informant revealed that Hudson recruited Sturgeon as a supplier on the Button Boys' behalf.

## II.

The government charged Hudson, Sturgeon, and Smith with one count of transporting an unregistered gun and one count of possessing and transferring a machinegun.  It also alleged that all three defendants aided and abetted each other.  Smith and Sturgeon signed plea agreements.  Smith fessed up to manufacturing switches and selling them to Sturgeon.  And Sturgeon admitted that he sold switches to Hudson, who helped him facilitate his own sales.  But Hudson pleaded guilty to both counts without signing an agreement.

Hudson went on to sentencing.  Sentencing can get complex, so we'll provide a highlight reel.  The district court applied several enhancements to Hudson's base offense level, but only two pertain to this appeal.  First, the district court increased the offense level by six because Hudson trafficked at least 25 switches.  U.S.S.G. § 2K2.1(b)(1)(C) (U.S. Sent'g Comm'n 2021).[1]  Second, it increased the level by four because Hudson sold switches with "knowledge, intent, or reason to

---

[1] At sentencing, the district court relied on the 2021 Guidelines Manual because Hudson committed his crimes before the Sentencing Commission released the 2023 Manual, and because the 2023 Manual increased an enhancement that factored into Hudson's sentence.  R.122, Sent'g Tr., PageID 528; R.113, Presentence Report, PageID 338; *see* U.S.S.G. § 1B1.11(b).

believe" that they'd be used in connection with other felony offenses: shootings and drug trafficking. *Id.* § 2K2.1(b)(6)(B). The district court also concluded that Hudson wasn't entitled to a minor role adjustment. *Id.* § 3B1.2(b). But it accounted for Hudson's acceptance of responsibility. So after applying the enhancements and adjusting for acceptance, the district court calculated a Guidelines range of 108 to 120 months' imprisonment. The latter is the statutory maximum. The district court imposed concurrent sentences of 108 months' imprisonment and three years' supervised release on each count.

### III.

Hudson isn't satisfied, so he appeals his sentence. He makes three arguments. First, he says that the district court erred in applying the "25+" enhancement. On his view, "no reliable facts" establish that he trafficked that many switches. Appellant Br. at 2 (citation modified). Second, he contends that the district court erred in applying the other-felony enhancement. He claims he wasn't aware that the Button Boys used switch-equipped guns to traffic drugs and settle scores (though he neglects to mention his own drug sales). And third, he protests that the district court erred in failing to recognize his "minor role" in the scheme. Appellant Br. at 36 (citation modified). Hudson's wrong on each point. We'll consider his arguments in turn.

A criminal sentence must be procedurally reasonable. That means the district court must "properly calculate the Guidelines range, treat the guidelines as advisory, consider the [18 U.S.C.] § 3553(a) factors and adequately explain the chosen sentence." *United States v. Snelling*, 768 F.3d 509, 512 (6th Cir. 2014).

If the government seeks a sentencing enhancement, it must establish by a preponderance of the evidence that the enhancement applies. *United States v. Parkey*, 142 F.4th 866, 869 (6th Cir. 2025). Conversely, if a defendant seeks a downward adjustment, he "bears the burden of

proving a mitigating role in the offense by a preponderance of the evidence." *United States v. Roberts*, 223 F.3d 377, 379 (6th Cir. 2000).

When we review a district court's calculation of the Guidelines range, we review its factual findings for clear error and its legal conclusion de novo. *United States v. Sands*, 948 F.3d 709, 712 (6th Cir. 2020). We haven't yet decided which standard applies to sentencing enhancements when we review mixed questions of law and fact. *See Parkey*, 142 F.4th at 869. But we don't need to pick one when, as here, the application of an enhancement meets either standard. *Id.*

**A.**

We'll start with the "25+" enhancement under U.S.S.G. § 2K2.1(b)(1). Hudson argues that only Smith and Sturgeon trafficked switches in bulk, and that he wasn't a part of this enterprise. In this vein, he contends that the photo and video evidence, his social media activity, and Smith's and Sturgeon's recollections don't establish that he partook in a broader switch-selling operation. And he says that he didn't personally sell 25 switches. On Hudson's telling, he helped Sturgeon sell only two switches. That's what he admitted to when he pleaded guilty, and he's sticking to his guns. But that's quite the understatement.

The Guidelines define "relevant conduct" for enhancement purposes. *See* U.S.S.G. § 1B1.3 (2021) (citation modified). The phrase includes "all acts" that a defendant "aided" or "abetted," and it also covers all acts within the scope of "jointly undertaken criminal activity" that are "in furtherance of" and "reasonably foreseeable in connection with" that activity. *Id.* § 1B1.3(a)(1). But when, as here, counts are "closely related"—like if they involve the "same act or transaction"—conduct is only "relevant" if it was "part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* §§ 1B1.3(a)(2), 3D1.2(d). A "common scheme or plan" refers to "common victims, common accomplices, common purpose, or similar

*modus operandi*." *Id.* § 1B1.3, cmt. n.5(B)(i). The "same course of conduct" is a slightly looser formulation. It refers to the "degree of similarity" and "regularity" of the offenses, as well as the "time interval" between them. *Id.* § 1B1.3, cmt. n.5(B)(ii).

Hudson sold or arranged the sale of at least 25 switches, so the "25+" enhancement reflects his conduct under any standard. In fact, he probably sold more than 25 switches on his own. Hudson was Sturgeon's "primary buyer." R.122, Sent'g Tr., PageID 469. So he likely bought "more than 25" switches from Sturgeon to supply the "entire group." *Id.* at PageID 469, 513.

Hudson contends that the most that the government's evidence established at sentencing regarding switch amounts was that Sturgeon bought most of Smith's switches and that Hudson bought a majority of those—a number that might not reach 25 if you start with 80. Putting aside the fact that this wasn't the government's only evidence, his collaboration with Smith and Sturgeon pushes him over the line. The enterprise ran as one machine: one manufacturer (Smith), one wholesaler (Sturgeon), one retailer (Hudson), and—in large part—one meeting place (Hudson's apartment) and one customer base (the Button Boys). And its gears turned in unison. Smith sold to Sturgeon, who sold to Hudson, who facilitated Sturgeon's sales and drove demand for Smith's product. Plenty of evidence supports these conclusions, and the district court considered all of it. *See, e.g.*, R.122, Sent'g Tr., PageID 442, 467, 469–70, 485, 514 (describing manufacture, distribution, and sale of switches, solicitation of customers, and facilitation of sales). And we've found a "course of conduct" and a "common scheme or plan" under far less damning circumstances. *See United States v. Gales*, 137 F. App'x 875, 877 (6th Cir. 2005) (isolated sales followed a "common pattern" where the defendant and his friends sold stolen guns to the same store). So Hudson's on the hook for the entire inventory—not just his personal sales. *See United States v. Gaitan-Acevedo*, 148 F.3d 577, 593–94 (6th Cir. 1998) (defendant responsible for drug

6

quantities reflecting mule's "reasonably foreseeable" deliveries); *United States v. Kish*, 424 F. App'x 398, 409 (6th Cir. 2011) ("[T]he number of firearms involved in the offense was the number distributed *and* made available for sale by [defendants].").

**B.**

Next, Hudson contends that he shouldn't have received the four-level enhancement for possessing switches in connection with another felony. This challenge fails too.

The possession-in-connection enhancement applies to defendants who "possessed any firearm . . . in connection with another felony" or who "transferred any firearm . . . with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B) (2021). That means the firearm must've "facilitated, or had the potential of facilitating," the felony. *Id.* cmt. n.14(A). In making this determination, we look to the relationship between the two offenses, "consistent with relevant conduct principles." *Id.* cmt. n.14(E). And we've noted that the enhancement doesn't apply "if possession of the firearm 'is merely coincidental to the underlying felony offense.'" *United States v. Seymour*, 739 F.3d 923, 929 (6th Cir. 2014) (quoting *United States v. Angel*, 576 F.3d 318, 321 (6th Cir. 2009)).

The district court considered two felonies, and both meet the test. So the enhancement applies.

First, Hudson's switch sales overlapped with his drug trafficking. And even if we only consider his fentanyl sales, Hudson's drug trafficking amounted to a felony. 21 U.S.C. § 841(b)(1)((B)(vi); U.S.S.G. § 2K2.1(b)(6)(B), cmt. n.14(C) (2021) ("another felony offense" means "any federal, state, or local offense, other than the . . . firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, *regardless* of whether a criminal charge was brought, or a conviction obtained" (citation modified)). Hudson ran a

combined switch and drug-trafficking operation, advertised both products, sold them as complementary goods, and even sold switches and drugs to the same customers in the same transactions. And he knew his fellow Button Boys used switches to traffic drugs because drug dealers flaunt their firepower to ward off thieves. He also knew it because he sent that message himself: Hudson and his associates posed with switch-equipped handguns and posted these photos and videos online.

So these facts are more striking than our typical "fortress theory" case, when we consider a gun's physical proximity to drugs. *Cf., e.g.*, *United States v. Shanklin*, 924 F.3d 905, 919–20 (6th Cir. 2019). Here, the inference is far stronger, and Hudson's conduct easily clears the bar. *See United States v. Henry*, 819 F.3d 856, 868 (6th Cir. 2016) ("The joint sale suggests that the firearm facilitated . . . the drug deal." (citation modified)); *United States v. Harrison*, 2020 WL 8921413, at *6 (6th Cir. Oct. 28, 2020) (enhancement applied because defendant's photos and videos depicted guns, drugs, and cash, and because defendant traded drugs for guns).

Second, Hudson sold switches that the government linked to various Cincinnati-area shootings. Since those shootings were felonies, the enhancement applies for this reason, too. *See* Ohio Rev. Code § 2903.11(A)(2) (defining "felonious assault" as any "attempt to cause physical harm to another . . . by means of a deadly weapon" (citation modified)). True, the typical case involves a defendant shooting his own gun. *See, e.g.*, *United States v. Turner*, 2025 WL 976380, at *4 (6th Cir. Apr. 1, 2025). But the enhancement specifically contemplates "transfer[ring] any firearm . . . with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B) (2021). That's what Hudson did. He sold switches to his own crew, so he had every reason to believe they'd use the devices to

8

dole out gang violence. The district court considered all the evidence and reached that unavoidable conclusion.

## C.

Finally, Hudson invites us to reconsider the district court's decision to deny him a minor-participant adjustment. *See* U.S.S.G. § 3B1.2(b) (2021). We decline.

In determining whether to apply the adjustment, a district court should consider certain non-exhaustive factors. Those factors include the defendant's understanding of the "scope and structure of the criminal activity," the defendant's role in "planning or organizing the criminal activity," the "degree to which the defendant exercised decision-making authority," the defendant's participation in the "commission of the criminal activity," and the "degree to which the defendant stood to benefit." *Id.* cmt. n.3(C). And the defendant "bears the burden of proving a mitigating role in the offense by a preponderance of the evidence." *Roberts*, 223 F.3d at 379.

Hudson hasn't shown that he's entitled to a role reduction. He was the fulcrum of the Button Boys' Glock switch operation. So the district court made the right call. The district court based its conclusion on Hudson's understanding of the operation's "scope and structure." R.122, Sent'g Tr., PageID 563. It noted that Hudson "participated in the planning" of some switch sales, conducted other sales himself, and acted as Sturgeon's middleman. *Id.* at 563–64. The district court also considered Hudson's "proprietary interest" in the sales. *Id.* at 564. It concluded that Hudson wasn't a "mule," but a full-fledged business partner. *Id.* We agree. And any reader who makes it this far would come to the same conclusion.

## IV.

For these reasons, we AFFIRM.