**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John VANAMAN, Enrique Ochoa, Lois
Jochinto Orta, Wayne McIntosh, and
Jon Hambrick, Defendant–Appellants.**

Nos. 99–5393, 99–5402, 99–5404, 99–5407.

United States Court of Appeals,
Sixth Circuit.

April 11, 2001.

Before WELLFORD, RYAN, and SUHRHEINRICH, Circuit Judges.

PER CURIAM.

Defendants appeal their convictions for conspiring to distribute and distributing methamphetamine. John Vanaman, Enrique Ochoa, and Lois Jochinto Orta, challenge the denial of their motions to suppress. Wayne McIntosh contests his sentence. McIntosh, Jon Hambrick, and Orta claim they should have had separate trials. Orta also claims that counts in the indictment were misjoined. Vanaman, Orta, Hambrick, and McIntosh also argue that the evidence was insufficient to convict. We AFFIRM.

## I. Background

Vanaman and Hambrick were truck drivers from Northern Kentucky. Mary Worley, a Government witness, met Vanaman in June 1997 through Hambrick. She became Vanaman's girlfriend and moved in with him at 140 Melinda Lane in Florence, Kentucky. She also became his partner in the drug trade. Vanaman routinely bought methamphetamine from William Gesell, and Ochoa in Riverside, California. Worley went with Vanaman to California in June 1997. On their first joint trip, they brought back two pounds to Kentucky, and distributed it to McIntosh and Hambrick.

In late June 1997, Worley, Vanaman, and McIntosh went to Decatur, Alabama, where they met with Ochoa, Gesell, and

Howard Alexander. Ochoa and Gesell agreed to transport methamphetamine from California for Alexander, who redistributed it to Vanaman and Worley. Worley also met Lois Orta at this meeting. Worley testified that Orta helped transport and guard the methamphetamine. Worley and Vanaman returned to Kentucky with one and a half pounds of methamphetamine. They distributed the drugs to Hambrick and McIntosh.

In early July 1997, Worley and Vanaman returned to Alabama. During this trip, Vanaman met with Ochoa, Gesell, McIntosh, and Alexander at a Comfort Inn in Athens, Alabama. Vanaman bought between three and five pounds of methamphetamine. Worley and Vanaman then distributed these drugs to McIntosh and Hambrick back in Kentucky.

Sometime in July, Vanaman convinced Gesell and Ochoa to end their arrangement with Alexander and move to northern Kentucky. Gesell testified that Vanaman told him that he was selling methamphetamine to McIntosh and Hambrick. Vanaman helped Gesell and Ochoa move into a trailer next to him at 144 Melinda Lane.

Also in early July, Vanaman hired Roy Taylor to transport methamphetamine from California. Vanaman, Gesell, and Ochoa agreed to pay Taylor $700 a week. In mid to late July, Taylor went to California to pick up fourteen and a half pounds of methamphetamine. Taylor flew to California and met Ochoa and Orta. Taylor and Orta used Ochoa's truck to drive the drugs back to northern Kentucky. Taylor was unable to complete the trip, so Vanaman finished the trip with Orta.

Worley helped unload the drugs, which were hidden in a speaker in Ochoa's truck. The methamphetamine was packaged in pound-size parcels, wrapped in Saran wrap, and covered in duct tape. Worley

and Vanaman again distributed the drugs to McIntosh and Hambrick.

On August 6, 1997, McIntosh and Vanaman had a fight and ended their business relationship.

Around August 15, 1997, Taylor went to California to pick up another shipment of methamphetamine. Taylor's truck broke down and he rented a car.

On August 25, 1997, McIntosh's roommate, Greg Harney, agreed to wear a wire and contact Vanaman at 140 Melinda Lane. Vanaman was not at home so Harney went next door to Gesell's and Ochoa's trailer. During a recorded conversation, Gesell and Ochoa laughed that Vanaman thought he was a "big ... narcotics dealer." They complained about how slow Vanaman had been selling their dope. That same day, officers saw Taylor's rental car in the driveway.

On August 25 or 26, 1997, Worley saw Gesell and Ochoa unloading methamphetamine from the rental car at 144 Melinda Lane. After it was unloaded, Ochoa took the drugs to the Super 8 Motel. Worley and Vanaman contacted Orta when they needed to obtain methamphetamine from Ochoa and Gesell.

On or about August 27, 1997, fearful that the police were on their trail, Worley and Vanaman hid their drug records in their house and rented a motel room at the Ramada Inn in Florence. Gesell went on vacation. Worley and Vanaman contacted Ochoa for more dope. Orta picked it up and delivered it to Vanaman and Worley, who then distributed two pounds to Hambrick on August 27 and another two pounds to him on August 28.

On August 28, 1997, Harney contacted Vanaman. During a taped conversation, Harney gave Worley and Vanaman money for two ounces of methamphetamine. Vanaman agreed to deliver the methamphet-

amine to Hambrick later that night. At the Burns Brothers Truck Stop in Florence, police saw Vanaman hand Harney the drugs.

The next morning, the police obtained search warrants for Room 137 of the Ramada Inn. Room 206 of the Super 8 Motel, 140 Melinda Lane, 144 Melinda Lane, and Hambrick's house in Walton, Kentucky. Jim Daley, the executive director of the Northern Kentucky Strike Force, testified that these warrants, which were to be executed simultaneously, were part of an ongoing investigation into methamphetamine trafficking in Northern Kentucky. The warrants were based in part on the information received the previous day that thirty to fifty pounds of methamphetamine had arrived in the area. Daley was responsible for coordinating and overseeing this operation. Daley stated that it was important to execute the warrants simultaneously because the officers were worried that some of the dealers, including Vanaman, were armed. They were also concerned that the dealers could warn each other and jeopardize the execution of the warrants and recovery of the contraband.

At approximately 4:00 a.m. on August 29, 1997, Detective Scott Lay, a member of the Northern Kentucky Strike Force, took five search warrants to Boone County, Kentucky, District Court Judge Charles Moore in Ft. Mitchell, Kentucky. Lay swore to the accuracy of the information affidavit attached to each warrant, which were identical. Lay inadvertently failed to sign two of the affidavits for the Super 8 Motel and the Ramada Inn, however.

When Lay presented the warrant applications to Judge Moore, he had not yet identified the room numbers for the two hotel rooms. Judge Moore testified that although he had decided to issue them, he would not sign the warrants for the two hotel rooms until the room numbers could be supplied. At 4:20 a.m., Judge Moore executed the remaining search warrants.

Lay told Daley that the judge would not sign the warrants for the two hotel rooms. At that time, Lay and Daley did not realize that Lay had not signed the affidavits for the two hotel rooms. They also thought that Judge Moore had signed the affidavit portion of the warrant applications. Daley also thought that once the room numbers were provided, Judge Moore would sign the warrants.

Daley sent Officer Ben Booher to the judge's house to wait for this information. When Booher left, he was aware of the Super 8 Motel room number. Meanwhile, efforts were made to coordinate the roughly thirty policemen involved in the investigation. At approximately 7:00 a.m., five search teams assembled near their respective search locations.

At approximately 7:00 a.m., Judge Moore advised Booher that Lay needed to sign the affidavits for the Ramada Inn and Super 8 hotel warrants. Between 7:12 a.m. and 7:15 a.m., Daley told Lay to return to Judge Moore's house. Daley also told Lay to call as soon as he had signed the affidavits because the search teams could not to wait for Lay to return.

At approximately 7:30 a.m., Lay signed the remaining affidavits in the judge's presence and supplied the room number on the warrant for the Super 8 Motel. Booher remained outside. Judge Moore did not notarize Lay's signature until 8:00 a.m., however.

At 7:31 a.m. Lay called Daley and mistakenly advised Daley that the warrants were ready to be executed. Because the room number for the Super 8 Motel had been inserted into the warrant and Lay had signed the affidavit, Daley thought the warrant was complete.

At 7:43 a.m., Detective Ellis, who was part of the team at Hambrick's residence, gave the "ready to go" signal and each team entered their respective properties. At that time, Daley believed Judge Moore had signed and authorized the Ramada Inn warrant.

At 7:46 a.m., Daley advised the search teams that the subject in Super 8 motel room. Ochoa, was armed. Ochoa was advised of his Miranda rights. Ochoa stated that Orta had rented the room, but had left the day before. Ochoa admitted that the firearm belonged to him. Officers also found twenty-eight pounds of methamphetamine and currency. Lay noted on the warrant that it was executed at 8:05 a.m., which reflected his estimate of the time they had finished securing the room and interviewing Ochoa.

Meanwhile, Booher waited at Judge Moore's residence. As soon as the signal was given, the Ramada Inn team approached the front desk. The desk clerk stated that Vanaman had not registered but eventually indicated that the customer in Room 137 had paid in cash. Within three to five minutes, Darren Smith and FBI Agent Carrell of the Ramada Team were in front of Room 137. Smith knocked and identified himself. Vanaman opened the door. As soon as he did, Carrell recognized Vanaman and confirmed the room number. The officers entered and secured the room.

At 7:56 a.m., Smith advised Booher of the room number. Booher relayed the number to Judge Moore and watched him sign the warrants for the Super 8 Motel and the Ramada Inn. Judge Moore noted the time as 8:00 a.m.

At 7:57 a.m., Smith asked Booher whether the "paperwork had a signature." Booher responded that "[y]ou're set for to go," which meant that Judge Moore had signed the warrant and it was ready to be execut-

ed. Booher then delivered the Ramada Inn and Super 8 search warrants.

Booher arrived at the Ramada Inn between 8:20 and 8:30 a.m. Smith and the Ramada Inn team did not begin to search until the warrant was delivered. When Smith received the warrant, he noted the time of execution on the warrant as 7:50 a.m. Smith testified that this was the time he knocked on the door and advised Vanaman of the warrant. The officers did not actually begin the search until 8:40 a.m., as reflected on their collection log.

The police found Worley at the Ramada Inn and seized numerous items, including paperwork labeled "Expenses," which referenced Orta. Several receipts with McIntosh's, Vanaman's and Taylor's names were also found. In the bathroom police discovered drug records, and one-half pound of methamphetamine. The officers recovered $14,000, and a roll of film which showed Worley, Hambrick and Vanaman in the motel room the night before. One picture showed Hambrick stuffing methamphetamine into his boot.

According to Worley and the drug records seized from the Ramada Inn, Hambrick bought two pounds of methamphetamine on August 28, for which he paid $12,000, leaving a $12,000 balance. Hambrick later bought another pound, leaving him a $24,000 balance.

Ochoa was found at the Super 8 Motel with a 10 mm semi-automatic weapon, fully loaded and cocked. In the nightstand officers found records referencing drug sales. They found $10,000 and twenty-seven pounds of methamphetamine. Orta had rented the room.

At the same time, officers entered Ochoa's, Gesell's, and Orta's trailer at 144 Melinda Lane. They found Orta in the living room with a business card from the Super 8 Motel. In Gesell's room, officers

found receipts representing payments for drugs purchased in California. Gesell's records showed that $30,040 had been sent to California to pay for methamphetamine. Officers also found airline receipts for travel from California to Cincinnati on August 23, 1997, note paper from the Days Inn Motel with Hambrick's phone numbers and directions to his house. In Ochoa's room, officers found a 9 mm pistol and a Western Union receipt dated August 22, 1997, reflecting a payment by Gesell to Ochoa for $1,500. Ochoa's day planner contained notes reflecting various amounts of money and details of travel expenses and drug debts. Many of the numbers recorded in these notes were identical to numbers found on notes in Gesell's room. Ochoa also had records that reflected payments for Taylor's trip to California.

At Hambrick's house, officers found McIntosh's address and phone number, electronic scales and baggies. Hambrick's stepson, Tim Carnes, who lived with Hambrick in the summer of 1997, testified that he saw Hambrick with ten to fifteen thousand dollars. Shortly before the warrant was executed, Carnes overheard Hambrick talking about a large quantity of drugs that was to be delivered. Hambrick also asked Carnes to help dismantle the vehicle that carried the drugs.

Vanaman, Ochoa, and Orta were arrested. Worley was released. Four days later, officers returned to 140 Melinda Lane. Worley had decided to cooperate and gave the officers drug records hidden there. These records, which Worley kept at Vanaman's direction, detailed methamphetamine purchases and sales, buyers, and payments and debts. These documents also recorded how much money was paid to Gesell and Ochoa for the fourteen and a half pound deal and the amount they owed. The numbers mirrored the numbers in the records found in Gesell's and Ochoa's rooms.

According to Worley's records, Vanaman sold pound quantities of methamphetamine to McIntosh on July 22, 1997 (3 pounds), August 4, 1997 (2 pounds), and August 6, 1997 (1 pound). Vanaman made similar sales to Hambrick on July 22, 1997 (2 pounds), July 27, 1997 (1 pound), August 3, 1997 (1 pound), and August 6, 1997 (1 pound).

On September 8, 1997, Officer Brian Kane stopped a 1976 Ford truck driven by Hambrick. Jack Gillen was riding with Hambrick. Gillen testified that when Hambrick was producing his driver's license, Gillen saw the butt of a handgun on the seat and observed Hambrick move towards it. Officer Kane saw Hambrick do the same. Hambrick consented to a search. Officer Kane found $11,000 on Hambrick and a box containing boots in the truck. Inside one of the boots he discovered two separately wrapped balls of methamphetamine. According to lab tests, this dope was cut with dimesthylsulphone, the same cutting agent found in the methamphetamine seized from the Ramada Inn and the Super 8 Motel. The officers also found a .38 pistol, and a small quantity of marijuana. Gillen denied owning the methamphetamine, the marijuana, or the gun.

On September 11, 1997, Vanaman, Ochoa, and Orta were charged with conspiring to traffic and trafficking in methamphetamine. On March 11, 1998, a second superseding indictment was returned adding five defendants, including Hambrick and McIntosh to the conspiracy charge. Vanaman, Ochoa and Orta moved to suppress. A magistrate judge recommended that the motions be denied. The district court adopted the magistrate judge's recommendations and the motions to suppress were denied. A jury convicted

the defendants. At sentencing, McIntosh received one hundred eighty-eight months imprisonment, Vanaman received three hundred sixty months; Ochoa received four hundred months; Orta received life imprisonment; and Hambrick received three hundred twenty-two months.

These consolidated appeals follow.

## II. Analysis

### A. Validity of Searches

Vanaman, Ochoa, and Orta appeal the denials of their motions to suppress. We review a district court's legal conclusions de novo. *United States v. Spikes*, 158 F.3d 913, 922 (6th Cir.1998). Factual findings are reviewed for clear error. *Id.*

#### 1. 140 Melinda Lane

■ Vanaman argues that the district court erred in finding sufficient probable cause to search 140 Melinda Lane. Vanaman claims that the facts detailed in Lay's affidavit do not connect his illegal activities to his private residence. We reject this argument. As the magistrate judge held

1) First, sources informed the police that Defendant Vanaman lived at this address;

2) Independent investigation verified this as Vanaman's address; his driver's license showed this address, as did his vehicle registration;

3) Two sources identified a supplier of methamphetamine, and independent investigation showed the supplier's vehicle at the 140 Melinda Lane address on at least one occasion;

4) The affiant noted that "routine practice" for drug traffickers is to have "telephone numbers, records of sales (coded and not coded), banking records, various types of reciepts [sic], various types of paraphernalia and case proceeds ... in their residence"; and,

5) The affiant finally noted that he had learned from one source that "Vanaman keeps detailed records of his involvement with the sale and distribution of methamphetamine at his residence."

Moreover, as the magistrate judge further noted, the affidavit indicated that two sources were " 'credible and reliable confidential sources.' " He further stated that, although the two sources did not know each other, " 'their information was essentially the same.' " The affiant also conducted an independent investigation, thereby buttressing the information provided by the unidentified confidential informants. *See United States v. King*, 227 F.3d 732, 742 (6th Cir.2000) (finding probable cause where the informant's tip was corroborated by the affiant's own investigation (citing *Illinois v. Gates*, 462 U.S. 213, 244, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Vanaman's reliance on *United States v. Leake*, 998 F.2d 1359 (6th Cir. 1993), is therefore misplaced. *Cf. United States v. Leake*, 998 F.2d 1359, 1365 (6th Cir.1993) (upholding a district court's finding of no probable cause where the affidavit was based on an anonymous tip, and police investigation revealed nothing suspicious).

In short, the affidavit supplied probable cause to support the search warrant. The district court did not err in concluding that, under the totality of the circumstances, there was a fair probability that contraband or evidence of a crime would be found at Vanaman's home. *See Gates*, 462 U.S. at 238, 103 S.Ct. 2317. *See generally United States v. Allen*, 211 F.3d 970, 975 (6th Cir.) (en banc) ("The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."), *cert. denied*, —— U.S. ——, 121 S.Ct. 251, 148 L.Ed.2d 181 (2000).

## 2. Ramada Inn

■ Vanaman also contends that the police began searching his motel room at the Ramada Inn before the warrant had been executed. In support, Vanaman points to the notations on the warrant indicated that Judge Moore signed it at 8:00 a.m., while Smith executed it at 7:50 a.m., ten minutes earlier. Vanaman therefore argues that the search of Room 137 is valid only if the Government can establish exigent circumstances. Vanaman claims that, although the Government had a reasonable belief that a third party was inside Room 137, it lacked a reasonable belief that the loss or destruction of evidence was imminent. *See United States v. Gaitan–Acevedo,* 148 F.3d 577, 585 (6th Cir.1998).

■ The general rule is that warrantless entries are presumptively unreasonable. *Id.* However, a warrantless entry to prevent the destruction of evidence is justified if the Government demonstrates (1) a reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that loss or destruction of evidence is imminent. *Id.; see also United States v. Ukomadu,* 236 F.3d 333, 337 (6th Cir. 2001); *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1512 (6th Cir.1988).

Vanaman concedes that the police had a reasonable belief that he was staying at the Ramada Inn because the Strike Force had kept him under surveillance throughout the night of August 28–29, 1997. He argues that the second prong is not met. Specifically, Vanaman notes that after Smith found out that the occupant in Room 137 paid in cash, he did not attempt to prevent the clerk from calling Vanaman, despite the fact that the officers suspected that someone at the front desk had ties to Vanaman.

The motion was properly denied as to the search of Room 137. The initial entry into Vanaman's motel room and protective sweep were justified by exigent circumstances. Daley testified that simultaneity was essential to prevent the suspects at one location from alerting targets at other spots who could then destroy the evidence. The officers also knew that some of the suspects, including Vanaman, carried a firearm, and had used methamphetamine, which causes paranoia.

Further, when the "go" signal was given the police believed that all the warrants were in order and that only the Ramada Inn room number was missing. Upon entering the hotel lobby, they quickly identified Vanaman's room and announced their presence. Once Vanaman was aware of their presence, the officers had to do a protective sweep and prevent any evidence from being destroyed.

In short, the officers had a reasonable belief that Vanaman was in the room, and that he would destroy the evidence once he knew the officers were there.

As the magistrate judge noted, the circumstances here were unique. Although Judge Moore had already decided that probable cause existed to search, he would not sign the search warrant until he had a room number. Thus, to obtain the room number, the officers had to knock on the door of Room 137 (which they suspected was Vanaman's room because it was paid for in cash), and confirm that Vanaman was inside.

Furthermore, the officers did not actually search Vanaman's room until after they had the search warrant in hand. The uncontested testimony of the officers showed that they did not search the room before the warrant was signed. The evidence log confirms that the first item was not seized until 8:40 a.m.. Although Smith wrote 7:50 a.m. as the time of execution (and ten minutes before Judge Moore signed the warrant), he testified that it was actually

the time the officers knocked on the door. Vanaman offered no testimony to refute this. Thus, the evidence gathered as a result of the Ramada Room search was properly admitted.

■ Even if the evidence was illegally gathered at 7:50 a.m., it did not need to be suppressed because it would have been inevitably discovered when the signed warrant arrived shortly thereafter. *See United States v. Leake,* 95 F.3d 409, 412 (6th Cir.1996).

■ For the first time on appeal, Orta also challenges the search at the Ramada Inn. Even if he had not waived the argument, we would not entertain it, because he lacks standing or a privacy right. *See Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The room was not registered in his name and there was no evidence that he stayed there.

### 3. Super 8 Motel

■ Ochoa and Orta claim that their Fourth Amendment rights were violated when the officers executed the warrant. Although the warrant had not been signed when the officers entered the motel room, the officers had a reasonable belief that it had been signed. As the magistrate judge held:

> Certainly the belief of the officers in this case fits within the language of the good-faith exception established in [U.S. v.] *Leon,* 468 U.S. [897]at 917[104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)], in that the officers were acting "in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." In *Leon,* the warrant under which police were operating was later found to be defective; here, the officers were operating under the belief that a warrant had been signed when it had not. Al-

though the circumstances differ somewhat, the reasons behind the exception apply. No deterrent effect can be obtained when the police were acting under objectively reasonable belief that their behavior did not violate the defendant's Fourth Amendment rights. *See id.* As discussed above, the officers here did have the necessary objectively reasonable belief that Judge Moore had signed the warrant.

(J.A. 115–16.)

The officers had a good faith belief that Judge Moore had signed the Super 8 motel warrant at 7:30 a.m. when they entered the room at 7:46 a.m. Lay returned to the Judge's residence at 7:30 a.m., signed the affidavit, and wrote the room number on the face of the warrant. Lay then told Daley the paperwork had been signed. Daley testified that he thought that the judge had signed the warrant. Thus, although the officers' initial entry of the room was illegal, it is undisputed that the warrant was signed within fifteen minutes of the illegal entry. As the magistrate judge found, the officers' belief was reasonable under the circumstances.

■ In addition, the evidence seized from the Super 8 Motel room was admissible under the inevitable discovery doctrine. *See Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (holding that evidence discovered during a police officer's illegal search need not be suppressed if that evidence is also discovered during a later search pursuant to a valid warrant that is wholly independent of the illegal search); *United States v. Kennedy,* 61 F.3d 494, 497–98 (6th Cir.1995); *Leake,* 95 F.3d at 412. Here, it is undisputed that the warrant was signed fifteen minutes after the officers entered the room. The warrant is based upon information wholly independent of anything ob-

served during the initial entry.[1] As the magistrate judge observed: "Where, as here, the mechanism to obtain the search warrant was begun before the alleged police misconduct, and the search warrant was obtained without the use of any information obtained through the misconduct, no deterrence rationale supports the exclusion of the evidence."

### B. Sentencing Reduction

■ McIntosh argues that the district court erred in denying him a sentencing "minor role" reduction.[2] Under § 3B1.2 of the Sentencing Guidelines, a "minor participant" is "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S. Sentencing Guidelines Manual, 3B1.2(b), cmt. n. 3 (1998). This determination is "heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, cmt. background (1998).

Although McIntosh was charged with only a single crime, it was conspiracy, and the proof at trial showed that he was buying pound quantities of methamphetamine from Vanaman as early as mid-June 1997. Further, the record established that McIntosh and Hambrick were the two main methamphetamine distributors in the Northern Kentucky area during this conspiracy. McIntosh sold the methamphetamine for profit. McIntosh also accompanied Vanaman and Worley on a buying trip to Alabama. This evidence clearly shows that he played an integral role in the overall conspiracy. Furthermore, a buyer and seller of drugs for profit is not a minor player. *See, e.g., United States v. Maliszewski*, 161 F.3d 992, 1022 (6th Cir.1998) (holding that the defendant was not entitled to a minor role reduction when "[s]he did what everyone else did: bought and sold [drugs]").

In any event, McIntosh's role must be viewed "in relation to the activity for which the court held him or her accountable." *United States v. Roberts*, 223 F.3d 377, 380 (6th Cir.2000); *United States v. Roper*, 135 F.3d 430, 434 (6th Cir.1998); *United States v. Walton*, 908 F.2d 1289, 1303 (6th Cir. 1990). McIntosh's presentence report attributes 11.75 pounds to him. This amount represents the amount he purchased for resale, not the total amount at issue in the larger conspiracy. Because McIntosh was held responsible for only those amounts attributable to him, he was not entitled to a reduction. *See Roberts*, 223 F.3d at 380 (holding that because the defendant's base offense level was predicated only upon acts of distribution in which he personally played substantial role, he was not entitled to a downward departure under § 3B1.2). The district court did not err.

### C. Joinder

McIntosh, Hambrick, and Orta all moved to sever. Hambrick and McIntosh renewed their motions at the close of the evidence, Orta did not. Thus, Hambrick's and McIntosh's motions are reviewed for abuse of discretion, *see United States v.*

---

1. *United States v. Griffin*, 502 F.2d 959 (6th Cir.1974) (per curiam), relied on by Defendants, is distinguishable. In that case, the police *intentionally* took a shortcut to circumvent the warrant requirement—they conducted an illegal search to determine if they should seek a warrant. In *Kennedy*, 61 F.3d at 499 n. 2, we stated that "although we adhere to the position that intentional short- cuts to the warrant requirement cannot be tolerated, we limit its application under *Murray* to facts similar to those in *Griffin*."

2. At oral argument, McIntosh withdrew his claim that the district court should have granted him a reduction under the safety valve provision. *See* 18 U.S.C. § 3553(c); U.S.S.G. § 5C1.2 (1998).

*Talley,* 194 F.3d 758, 765 (6th Cir.1999), *cert. denied,* 528 U.S. 1180, 120 S.Ct. 1217, 145 L.Ed.2d 1118 (2000). Orta's is reviewed for plain error. *See id.*

 Rule 8(a) of the Federal Rules of Criminal Procedure authorizes joinder when the charged offenses "constitut(e) parts of a common scheme or plan." Rule 14 provides for severance of defendants where joinder would prejudice a defendant. Fed.R.Crim.P. 14. Joint trials are preferred, *United States v. Cobleigh,* 75 F.3d 242, 247 (6th Cir.1996), especially when the charges will be proved by the same evidence, *United States v. Critton,* 43 F.3d 1089, 1098 (6th Cir.1995), as with conspiracy cases. *United States v. Weiner,* 988 F.2d 629, 634 (6th Cir.1993). The burden is on the defendant to prove that a severance is warranted. *United States v. Warner,* 971 F.2d 1189, 1196 (6th Cir. 1992).

McIntosh, Hambrick, and Orta, were charged with several other co-conspirators in a large-scale methamphetamine operation that ran from June until August 1997. The record reflects that McIntosh and Hambrick were buyers, and Orta was involved in transporting and protecting the drugs. Although they played different roles, they had a common goal. Moreover, none have offered sufficient evidence to rebut the "strong presumption" favoring joint trials. *See Critton,* 43 F.3d at 1098.

 McIntosh's claim that he should not have been tried with other defendants facing multiple drug and gun counts must be rejected. The Government differentiated between the defendants, and the jury was instructed to evaluate each defendant separately. *See United States v. Davis,* 177 F.3d 552, 557–58 (6th Cir.1999).

 Hambrick claims that the counts dealing with his September 8, 1997 arrest should have been severed from the other counts, because he was prohibited from possibly testifying about the September 8 events. Specifically, he claims that he could have testified that the contraband in the truck was Gillen's. Apparently, at some point during the questioning but prior to the consented search, Gillen was alone inside the truck. Hambrick contends that had he chose to testify, he would have been confronted with Worley's testimony that he was actively involved in the methamphetamine conspiracy, would have been forced to acknowledge his guilt on the counts relating to the conspiracy, but then attempt to persuade the jury of his innocence on the firearm and possession charges.

"[S]everance is not mandatory simply because a defendant indicates that he wishes to testify on some counts but not on others ." *United States v. Forrest,* 623 F.2d 1107, 1115 (5th Cir.1980) (quotation marks omitted). Hambrick has not met his burden of showing "that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Id.*

Although Hambrick was not arrested on the date the conspiracy ended, August 29, 1997, according to Worley and drug notes found at the Ramada Inn, Hambrick was still in possession of four pounds of methamphetamine. More importantly, the two ounces of methamphetamine found inside Hambrick's boot on September 8, 1997, were cut with dimethylsulphone, the same cutting agent used in the dope found in the two motel rooms. Furthermore, one of the pictures retrieved from a roll of film found in the Ramada Inn room showed Hambrick stuffing methamphetamine into his boot. Thus it was reasonable to infer that the methamphetamine discovered on September 8, 1997, came from the pound quantities Hambrick had purchased from

Vanaman and Worley on August 27 and August 28, 1997.

■ Finally, the district court did not commit plain error in denying Orta's motion to sever. Although Orta was not personally involved in the sale of the methamphetamine to Hambrick or McIntosh, he transported it from California to Kentucky. In short, no misjoinder occurred.

### D. Sufficiency of Evidence

Vanaman, McIntosh, Hambrick, and Orta claim that the evidence was insufficient to support their convictions. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ A conspiracy is established under 21 U.S.C. § 846, if the Government proves the existence of an agreement to violate the drug laws and that each conspirator knowingly and voluntarily joined the conspiracy. *United States v. Avery*, 128 F.3d 966, 970 (6th Cir.1997). The Government need not show that a defendant participated in all aspects of the conspiracy, *id.* at 971, but simply prove that the defendant was a party to the general agreement. *Id.* Furthermore, the Government is not required to prove that a defendant knew every member of the conspiracy or the full extent of the enterprise. *United States v. Lloyd*, 10 F.3d 1197, 1210 (6th Cir.1993).

■ Under 21 U.S.C. § 841(a)(1), the defendant must knowingly possess a controlled substance with the intent to distribute it. *United States v. Phibbs*, 999 F.2d 1053, 1063 (6th Cir.1993). A defendant aids and abets the commission of a crime if he associates himself in some way with the criminal venture in an effort to make it succeed. *United States v. Clark*, 928 F.2d 733, 736 (6th Cir.1991).

■ Vanaman's role in the conspiracy is clearly established. The record shows that Worley and Vanaman began purchasing methamphetamine in June 1997 in California. When they returned to Kentucky, Worley and Vanaman sold two pounds of methamphetamine to Hambrick and McIntosh. Vanaman also traveled to Alabama three times to purchase methamphetamine for resale. These drugs were sold to Hambrick and McIntosh.

In mid to late July 1997, at Vanaman's behest, Taylor and Orta picked up fourteen and one half pounds of methamphetamine. Back in Kentucky, Worley and Vanaman distributed the drugs to McIntosh and Hambrick.

■ On August 25, 1997, Taylor delivered approximately thirty pounds of methamphetamine to Ochoa. Ochoa took most of it to the Super 8 Motel. According to Worley, Hambrick bought three pounds of this methamphetamine from her and Vanaman on August 27–28, 1997. Orta delivered this methamphetamine to them. Worley's testimony supports both Hambrick's conspiracy conviction and Orta's conviction for aiding and abetting Hambrick's possession of methamphetamine with intent to distribute it.

Hambrick's argument that he was merely a purchaser of methamphetamine and not a member of the conspiracy is meritless. That he was a member of the conspiracy is confirmed by the fact that Vanaman "fronted" drugs to him. *See United States v. Rodriguez*, 53 F.3d 1439, 1445 (7th Cir.1995) (holding that evidence established a conspiracy, where, *inter alia*, the defendant was "fronted" drugs, and pay later after selling them).

■ McIntosh also had an agreement to buy pound quantities. Although he was only involved in the first part of the conspiracy, it is not necessary that he participate in all aspects of it. *See Avery,* 128 F.3d at 970–71. Worley's testimony and the records seized from 140 Melinda Lane provide sufficient proof of his involvement.

### III. *Apprendi* issues

At oral argument, defendants Hambrick and Orta claimed for the first time that the Supreme Court's recent decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), impacted their sentences. They can raise this issue in a § 2255 issue in the district court. *See* 28 U.S.C. § 2255.

### IV. Conclusion

For all the foregoing reasons, the judgment of the district court is AFFIRMED.

