NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0438n.06
Filed: July 23, 2008

No. 05-1558

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| *Plaintiff-Appellee*, | ) | |
| | ) | |
| v. | ) | |
| | ) | **O P I N I O N** |
| OLEE WONZO ROBINSON, | ) | |
| | ) | |
| *Defendant-Appellant*. | ) | |

BEFORE: BATCHELDER, MOORE, and COLE, Circuit Judges.

PER CURIAM. Defendant-Appellant Olee Wonzo Robinson appeals the district court's denial of his motion for a new trial, alleging that: (1) he did not knowingly and intelligently waive his trial attorney's conflict of interest; (2) the Government withheld material and exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500(b); (3) the Government used false testimony to obtain his drug-related convictions; and (4) he is entitled to an evidentiary hearing on his motion. For the following reasons, we **AFFIRM**.

## I. BACKGROUND

On November 5, 1993, a grand jury in the Eastern District of Michigan returned a fourteen-count superseding indictment, charging Robinson with multiple offenses, including conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; drug-related homicide and aiding and abetting in drug-related homicide, in violation of 21 U.S.C.

§ 848(e)(1)(A) and 18 U.S.C. § 2; making false statements to a federally insured institution, in violation of 18 U.S.C. § 1014; laundering of monetary instruments and aiding and abetting in the same, in violation of 18 U.S.C. §§ 1956 and 2; engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848; being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1); structuring financial transactions to evade reporting requirements and aiding and abetting in the same, in violation of 31 U.S.C. § 5324(3) and 18 U.S.C. § 2; and the distribution of cocaine and aiding abetting in the same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. After trial, which began on November 8 and ended on December 22, 1993, a jury returned a guilty verdict on all counts.

The district court sentenced Robinson to life imprisonment on the continuing criminal enterprise and drug-related homicide convictions, and imposed lesser sentences for the other convictions, all to be served concurrently. In 1995, Robinson filed a direct appeal, and a prior panel of this Court affirmed his convictions and sentence in all respects. *United States v. Robinson*, 96 F.3d 1449, 1996 WL 506498 (6th Cir. Sept. 5, 1996) (table). While his direct appeal was pending, on May 8, 1995, Robinson filed a motion for a new trial on the grounds that the Government had failed to provide Robinson with material exculpatory evidence. The district court issued a brief order denying the motion without prejudice, and Robinson appealed that order.

While the denial of the first motion for a new trial was on appeal, Robinson filed a second motion for a new trial, which raised two additional claims: (1) the Government knowingly used false testimony against him; and (2) Robinson's trial attorney failed to disclose a conflict of interest. The district court dismissed this motion as moot because the appeal of the first order was still pending.

On November 30, 1995, and again on May 3, 1996, Robinson filed a third and fourth motion for a new trial, which raised similar grounds for relief as his prior two motions. The district court denied the third and fourth motions for a new trial because Robinson's direct appeal had not yet been disposed of by this Court.

After we affirmed Robinson's conviction and sentence, *id.*, we issued a subsequent decision vacating the district court's order denying Robinson's motion for a new trial, and remanding the case to the district court for ruling on the merits of the motion, *United States v. Robinson*, 125 F.3d 856, 1997 WL 615764 (6th Cir. Oct. 3, 1997). On October 29, 1997, Robinson, acting pro se, filed a fifth motion for a new trial, consolidating many of the same arguments as the previous four motions, though not raising the claim that his trial attorney had a conflict of interest.

On April 22, 1998, the parties reached a stipulation that Robinson's newly appointed counsel, Margaret Raben, would incorporate all of Robinson's previous motions in a consolidated motion. According to Robinson, however, Raben failed to file that pleading.

In November 2002, four and a half years after the stipulation and order to file a consolidated motion, the district court ordered newly retained counsel Bruce Welch to file a "proper" motion for a new trial, which he did. In February 2005, Magistrate Judge Wallace Capel, Jr. issued a Report and Recommendation ("Report") that the motion be denied. The Report concluded that Robinson's sixth and final motion for a new trial, filed in 2002, was untimely, and that the district court should only consider Robinson's fifth motion for a new trial, which did not raise the conflict-of-interest issue.

Robinson objected to the Report on the following grounds: that an evidentiary hearing on the conflict-of-interest issue was necessary; that an evidentiary hearing was necessary to determine whether Anthony Bowling and Edward Osborne, two co-conspirators and key witnesses against Robinson, had committed perjury; and that Robinson had not had not received all pertinent discovery pertaining to Osborne and Bowling. Robinson also stated: "As for the other issues, Petitioner relies on the pleadings previously filed that the information is newly discovered and that he is entitled to an evidentiary hearing." (Joint Appendix ("JA") 2563.)

In April 2005, the district court denied Robinson's objections and adopted the Report. *United States v. Robinson*, 366 F. Supp. 2d 498 (E.D. Mich. 2005). The court first found that an evidentiary hearing on his trial attorney's conflict of interest was unnecessary because Robinson "clearly waived the conflict of interest issue in writing and at a hearing" before trial began. *Id.* at 506. With respect to the *Brady* and false testimony issues, the court concluded that "the Government did disclose the plea agreements to [Robinson], and the transcripts of the various proceedings could have been ordered by defense counsel." *Id.* And even assuming that the prosecution did withhold material exculpatory evidence, or used false testimony at trial, Robinson had not shown "that the new evidence 'would likely produce an acquittal if the case was retried.'" *Id.* at 506-07 (citing *United States v. Turns*, 198 F.3d 584, 586 (6th Cir. 2000)). Robinson timely appealed.

## II. ANALYSIS

We review the denial of a motion for a new trial based on newly discovered evidence for an abuse of discretion. *United States v. Gaitan-Acevedo*, 148 F.3d 577, 589 (6th Cir. 1998). For the discovery of new evidence to warrant a new trial, a defendant must show the following: "'(1) the

new evidence was discovered after the trial; (2) the evidence could not have reasonably been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce acquittal.'" *Id.* (quoting *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994)).

## A. Conflict-of-Interest Claim

### 1.

We first address whether Robinson waived the conflict-of-interest claim by failing to properly object to the Report. In *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981), we established this circuit's rule that a party's failure to object to a magistrate judge's report, within the time provided for filing objections, operates as a waiver of that party's right to appeal. *See also Thomas v. Arn*, 474 U.S. 140, 142 (1985) (affirming the constitutionality of *Walters* waiver rule). Because the Report concluded that Robinson's most recent motion for a new trial, filed in 2002, was untimely, it only considered the earlier motion for a new trial filed in 1997, which did not explicitly mention the conflict-of-interest issue. According to the Government, Robinson waived any appeal of this issue because he did not object to the untimeliness finding.

While the procedural history of this case is complex, we ultimately conclude that Robinson's substantive claims for relief are without merit, and therefore find it unnecessary to address the various procedural arguments advanced by the Government. *See Thomas*, 474 U.S. at 142 (noting that *Walters* rule is procedural and not jurisdictional).

### 2.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. XI. This right to counsel includes a "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981); *see also Cuyler v. Sullivan*, 446 U.S. 335, 345 (1980). The district court's legal conclusions that no conflict of interest existed and that Robinson's waiver was constitutionally valid are reviewed de novo, but the underlying factual bases upon which the district court's conclusions rest are reviewed for clear error. *United States v. Osborne*, 402 F.3d 626, 630 (6th Cir. 2005).

Before Robinson's trial, the Government notified his attorney, Christopher Andreoff, of a potential conflict of interest because Andreoff's former clients in other cases, Bowling and Osborne, two co-conspirators on the drug and money-laundering charges, would be central witnesses against Robinson. After Andreoff entered his appearance for Robinson, the Government once again expressed a concern that a conflict of interest existed, this time because Andreoff had previously represented both Bowling and Osborne in related charges. On June 14, 1993, Andreoff filed a brief and affidavit stating that Bowling and Osborne had not implicated Robinson during the course of his representation of them.

The district court then held a hearing to resolve the conflict-of-interest issue, at which time Andreoff repeated that "Osborn[e] never provided any information to me, nor did he cooperate with the Federal Government relative to anything relating to Mr. Robinson during the course of my representation." (JA 2575.) After informing Robinson of the risks of waiving his attorney's conflict of interest, the court approved a waiver, conditioned upon the execution of similar waivers by

Osborne and Bowling. All the parties stipulated that during Robinson's trial, another attorney, Brian Legghio, would act as co-counsel for Robinson and cross-examine Bowling and Osborne.

"A defendant may make a knowing, intelligent, and voluntary waiver of [his] right to conflict-free counsel, and a defendant has a Sixth-Amendment right to counsel of [his] choice." *United States v. Straughter*, 950 F.2d 1223, 1234 (6th Cir. 1991). Such a waiver "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Robinson contends that his waiver was not knowing, voluntary, and intelligent, because Andreoff allegedly knew, all along, that Bowling or Osborne planned to implicate Robinson. We disagree.

The district court took great lengths to advise Robinson of the potential consequences of a waiver. At one point, the court told Robinson that he may "learn of information that Mr. Osborn[e] or Mr. Bo[w]ling has that . . . could be significantly damaging to you in the trial of your case." (JA 2589-90.) And if such information did arise, the court explained that it "is against your interest for Mr. Andreoff to represent you because he will be restricted in the manner in which he cross examines." (JA 2590.) To which, Robinson responded: "I understand. I talked with him in great length. . . . And I trust him. And also I got 10, 11 years Detroit Police. And I've, you know, been in, you know, cases and everything before. So I understand, you know, the situation." (JA 2590-91.) The court then asked, "Okay. What if you're wrong?" Robinson then answered:

> Well if I am wrong, I'm willing to sign and take the risk. . . .
> Whatever the risk and the consequences may be, I'm well aware of it.
> . . . We went over it all of ten times. . . . I'm total[ly] aware of my
> business, the people that making the statement where everything of
> that, what they may or may not say, it will not interfere with anything.
> And if it did, I've decided that we'll go forward with the case.

(JA 2591-92.)

After the district court went over the explicit terms of the waiver, the court, once again, explained to Robinson that he should not "rely on [Andreoff's] knowledge that there will never be anything or there never has been anything that he's been told by either Osborn[e] or Bo[w]ling that could be admitted in this case." (JA 2595-96.) Robinson repeatedly said that he understood the risks.

We do not find any merit in Robinson's contention that the purported misstatements by Andreoff rendered his waiver unknowing and involuntary. Robinson points to an ex parte hearing held to determine whether Andreoff could represent Bowling during Bowling's sentence. At this hearing, Andreoff admitted that "Bowling has been cooperating with the Government in a number of matters" and "has implicated [Robinson]." (JA 2530-31.) But Andreoff also stated that he had "never been present in any of the debriefings," that he did "not know the specifics of [Robinson's involvement], other than it related to the bank fraud matter at one point," and that he was "ignorant" of any other matter outside of the money-laundering charges. (JA 2531.) This is entirely consistent with Andreoff's subsequent affidavit, in which he stated that none of the discovery materials provided during Bowling's case implicated Robinson.

Nor does a conversation between Bowling and Osborne, recorded by federal authorities, change our analysis. First, nothing in the conversation shows that Andreoff knew Bowling and Osborne intended to incriminate Robinson. Second, Robinson was aware of the conversation prior to waiving Andreoff's conflict of interest. Andreoff testified, at the hearing, that he "submitted and sent to Mr. Robinson a copy of a . . . conversation that took place between Mr. [Bowling] and Mr. Osborn[e]" and "advised him to seek other counsel." (JA 2581.) Contrary to Robinson's assertions, there is simply no evidence that Andreoff actively covered up what he knew about Bowling and Osborne.[1]

Robinson was also informed of these potential conflicts in great detail. Mark Jones, the attorney for the Government, specifically warned that Osborne and Bowling were "critically important Government witnesses" who would provide important testimony as to Robinson's drug and murder charges. (JA 2583.) Robinson had full knowledge of the situation and potential risks, yet ultimately decided to waive his attorney's conflict of interest.

We acknowledge that the purpose of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). "The District Court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of

---

[1] Robinson also points to the fact that Andreoff represented Bowling at his plea hearing in April 1992, but this was disclosed to Robinson prior to the waiver of conflict.

a serious potential for conflict." *Id.* at 164; *see also United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000).

The problem is Robinson has not demonstrated either an actual conflict of interest or a serious potential for conflict. As stipulated by the parties, another attorney, Brian Legghio, cross-examined both Bowling and Osborne at trial. Robinson did not demonstrate, by way of example, that his attorney Andreoff was forced to make a choice between two alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to Robinson but harmful to either Bowling or Osborne. *See Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987) (noting that a defendant must "point to specific instances in the record to suggest an actual conflict" and "make a factual showing of inconsistent interests") (citations omitted).

Finally, Robinson has made no attempt to show that a different attorney would have resulted in his acquittal, *see Gaitan-Acevedo*, 148 F.3d at 589, and the record is replete with evidence corroborating the testimony of Bowling and Osborne.

## B. *Brady* and Jencks Act Claims

### 1.

Robinson argues that the Government's failure to disclose certain evidence constitutes a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), thereby requiring a new trial. Pursuant to *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Courts consider undisclosed evidence material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result

of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.*

Robinson contends that the Government withheld the following material, exculpatory evidence: (1) the transcript of Bowling's pre-September 1993 grand jury testimony; (2) Bowling's statements to the FBI; (3) Bowling's polygraph statements; and (4) the transcript of Bowling's guilty-plea hearing. None of Robinson's arguments are compelling.

### (a) *Transcript of Bowling's Grand Jury Testimony*

Prior to trial, Bowling's grand jury testimony on February 5, 1993, which implicated Robinson in drug trafficking, was provided to Robinson's lawyers. Robinson's other counsel, Brian Legghio, even confronted Bowling with its contents on more than one occasion during cross-examination. Robinson now claims that there is a second grand jury transcript which he was denied, but cites no evidence that such a transcript exists.

### (b) *Bowling's Statements to the FBI*

Robinson claims that he was not provided the FBI-302 reports of an interview with Bowling, but the record shows that these documents were provided to the defense. During the cross examination of Bowling, moreover, Robinson's counsel made repeated references to having reviewed Bowling's FBI reports and grand jury testimony.

### (c) *Bowling's Polygraph*

Robinson and his attorneys also had notice that Bowling had taken a polygraph examination. As Legghio commented during trial, "it's my understanding that Mr. Bowling took a polygraph examination . . . . And I just want to make sure that the witness is instructed that he's at no time

supposed to say lie detector or polygraph." (JA 3076.) The polygraph test in question also had nothing to do with Robinson; it was administered to determine whether Bowling had any culpability in the shooting of Ricky Muldrew, a co-defendant in Bowling's drug case. (Bowling denied any culpability and passed the examination.) Robinson now claims that the polygraph exonerated him of the drug violations, but nothing in the record supports this.

(d) *Plea Transcript*

Robinson asserts that during Bowling's plea hearing on April 30, 1992, Bowling stated under oath that there were only two individuals who supplied him with cocaine, which excluded Robinson as a co-conspirator. Robinson now believes that because he was not provided the plea transcript, he was denied material impeachment evidence. But Bowling testified that he had "more than one" supplier, not that he had *only* two suppliers, which can hardly be considered material impeachment evidence. In any event, transcripts are kept by the clerk of the court and, unless sealed, are available to the public upon request. When transcripts do not exist, they can be transcribed into a readable format by a court reporter. They are not, as Robinson contends, information which the government possesses and a defendant does not. *United States v. Conteh*, 234 F. App'x 374, 389 (6th Cir. 2007).

**2.**

The Jencks Act provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). Robinson has pointed to no statement of a witness that the Government denied him, nor did he file a motion for such disclosure.

## C. False Testimony Claim

In order to prevail on a claim that a conviction was obtained with the use of evidence that the Government knew or should have known was false, a defendant "must show (1) that the statements were actually false; (2) the statements were material . . .; and (3) [the] prosecution knew they were false." *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986) (quoting *United States v. Chagra*, 735 F.2d 870, 874 (5th Cir. 1984)).

Robinson argues that the Government knowingly used false testimony when it allowed Bowling to testify about Robinson's involvement in the drug conspiracy. Robinson bases this claim on the fact that the FBI-302 reports, plea transcript, and polygraph would have undermined Bowling's testimony about his drug-related convictions because Bowling only identified Marcel Mays and Andre Hassan, and not Robinson, as his drug sources. For the same reasons as the *Brady* claim, this argument is unpersuasive. For one, as we have already explained, Robinson received the relevant reports and could have requested the plea transcript. Indeed, his attorney used these very documents during Bowling's cross-examination to challenge his credibility. For another, there is no part of Bowling's prior statements that exonerate Robinson. The mere fact that Bowling did not mention Robinson as a source in these documents does not exclude Robinson from the drug conspiracy.

## D. Failure to Grant an Evidentiary Hearing

Finally, Robinson contends that he was entitled to an evidentiary hearing on the conflict-of-interest and false testimony issues. Because we conclude that district court properly concluded that none of Robinson's grounds for a new trial have merit, he is not entitled to an evidentiary hearing.

## III. CONCLUSION

For the aforementioned reasons, we **AFFIRM**.