NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0116n.06

No. 21-1497

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 07, 2023
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA, )
)
    Plaintiff-Appellee, )
)
v. )
)
RAYMOND W. ADAMS, )
)
    Defendant-Appellant. )
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

OPINION

Before: GRIFFIN, WHITE, and THAPAR, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** After he was convicted by a jury of drug and firearm offenses, Defendant-Appellant Raymond Adams learned that his trial counsel had represented another participant in the incident that gave rise to Adams's convictions. Adams moved for a new trial and an evidentiary hearing, contending he was deprived of his Sixth Amendment right to counsel free of any conflict of interest. The district court denied relief and, finding no error, we AFFIRM.

I.

On August 30, 2017, law enforcement executed a search warrant for Adams's home in Inkster, Michigan, and found, among other things, crack cocaine, powder cocaine, heroin, and firearms. Adams told law enforcement that, when they entered the home, he was in the basement with his friend, Bobby Jenkins. Occupants of a car parked outside Adams's house at the time of the search also stated that Jenkins was in Adams's basement; officers found Jenkins's wallet and $5000 cash in the car. Law enforcement, however, did not find Jenkins in the house nor did they

see him flee the scene. Adams was arrested the day of the search, and so was Jenkins sometime later.[1]

Attorney Kenneth Scott entered an appearance on behalf of Jenkins on September 12, 2017, in relation to a petition charging Jenkins with violating the terms of his supervised release based on his conduct at Adams's house.[2] In relevant part, the petition alleged that, at Adams's home, Jenkins both committed a federal, state, or local crime and associated with persons engaged in criminal activity and/or persons convicted of a felony. A hearing was held on September 12, 2017, at which the government called Officer Neil Egan, who testified to the events at Adams's house. Officer Egan testified that Adams had a prior felony conviction, that law enforcement recovered drugs from the basement, and that law enforcement believed Jenkins was downstairs with Adams just before the execution of the search warrant – although neither he nor members of his team saw Jenkins at the scene. Officer Egan also testified that Adams had video surveillance at his home but that he was unaware whether the surveillance recording was retrieved or reviewed. In summation, the government argued that Jenkins had constructive possession of the drugs in Adams's basement. The district court declined to make that finding. The district court nevertheless concluded that, by being at Adams's home, Jenkins had associated with persons engaged in criminal activity and/or convicted of a felony. On September 19, 2017, the district court revoked Jenkins's supervised release and sentenced him to 12 months incarceration. Scott represented Jenkins for a total of eight days.

---

[1]     Jenkins was arrested because "he had a warrant out for his arrest for something unrelated to" the events at Adams's house. R.86 PID 1174. The precise date of Jenkins's arrest is not in the record.

[2]     The filings related to Jenkins's violation of supervised release proceedings can be found at *United States v. Jenkins*, No. 04-80033 (E.D. Mich.).

Adams was charged in a seven-count indictment.[3]  Scott entered an appearance on behalf of Adams on September 11, 2017—*i.e.*, one day before he did so on behalf of Jenkins.  Adams's trial began over a year later, on January 23, 2019.  Scott's opening statement to the jury proposed that Adams was not the owner of the drugs; rather, they belonged to others in the house who fled.

As it had at Jenkins's violation of supervised release hearing, the government called Officer Egan as a witness at Adams's trial.  Officer Egan testified that law enforcement recovered drugs from Adams's home and concluded they were Adams's.  He testified on cross examination:

> Q. In fact, everything that you located in the house you indicated that it belonged to Mr. Adams.  Is that a fair statement?
>
> A. That's a fair statement.
>
> Q. And you never saw Mr. Adams in possession of any of these items; is that a fair statement?
>
> A. Correct.
>
> Q. So you indicated that it belonged to him.  Was your reason behind that he was the man of the house?
>
> A. Well, it's based on the totality of the investigation.

R.86 PID 1020.  Officer Egan also recalled seeing security cameras as he approached Adams's house but could not recall any cameras or recording equipment inside the house.  His testimony specifically addressed Jenkins only once, when the government, on redirect, asked him about Jenkins's arrest shortly after the search of Adams's house.  Although Scott did not ask Officer

---

[3]     Adams's seven charges were: (1) possession with intent to distribute crack cocaine, 21 U.S.C. § 841; (2) possession with intent to distribute powder cocaine, 21 U.S.C. § 841; (3) possession with intent to distribute heroin, 21 U.S.C. § 841; (4) possession of a firearm in furtherance of a drug trafficking offense, 18 U.S.C. § 924(c); (5) possession of a firearm by a previously convicted felon, 18 U.S.C. § 922(g)(1); (6) possession of ammunition by a previously convicted felon, 18 U.S.C. § 922(g)(1); and (7) maintaining a drug involved premises, 21 U.S.C. § 856.

Egan about Jenkins, he questioned other government witnesses about Jenkins's presence at the house.

After the government rested its case-in-chief, Scott moved to dismiss the one count stemming from crack cocaine (which was found only in the basement) because, in part, "there was a Bobby Jenkins in the basement" and no testimony concerned Adams's participation in any drug distribution. R.87 PID 1288-89. The government opposed, pointing out that no testimony or evidence proved "that Mr. Jenkins was, in fact, in the residence at the time of the search." *Id.* PID 1291. The district court denied Adams's motion.

At some point during the trial, the issue of Scott's representation of Jenkins came up during a sidebar, but the conversation was not transcribed. The government attorney recalled stating to Scott, "it's kind of ironic that you represented Bobby Jenkins as well," to which Scott responded, "I'm aware of that, but that was a different case and that was a different day." R.160 PID 2723.

Only one of Adams's defense witnesses mentioned Jenkins, testifying that Jenkins was in Adams's basement immediately before the search and that the witness did not know when Jenkins left. This witness and other defense witnesses also testified that Adams had surveillance and recording equipment inside and outside his house.

Anticipating Scott's defense, the prosecution's closing argument addressed the claim that the drugs were Jenkins's, not Adams's, describing it as speculation. Scott's closing argued that the drugs belonged to Jenkins. Scott posited that Jenkins ran away, leaving his wallet and $5,000 behind, because he was guilty, and that Adams, in contrast, did not flee because he was innocent. Scott added that law enforcement's deliberate failure to obtain Adams's surveillance recordings prevented the jury from observing whether Jenkins brought the drugs into Adams's house and how Jenkins got away. In rebuttal, the government argued that

[W]hat the defense wants you to do is speculate and speculate that just because Bobby Jenkins was in that basement at some point before the search that all of the drugs, including the drugs in the defendant's bedroom and the drugs in the basement and the guns and the ammo, that those must have been Bobby Jenkins'[s] and not this defendant's. Well, the defendant must be the unluckiest man in the world that on the day that Westland police happened to search his house that Bobby Jenkins happened to be at his house with $20,000 worth of drugs and left his drugs in the defendant's house, which the police found.

R.90 PID 1740. On February 5, 2019, the jury found Adams guilty on all counts.

On October 18, 2019, attorney Alvin Keel entered an appearance on behalf of Adams, whom the district court had not yet sentenced. One month later, Keel moved for a new trial and an evidentiary hearing, asserting that Scott's representation deprived Adams of his Sixth Amendment right to conflict-free representation because Scott's representation of Jenkins prevented Scott from impeaching Officer Egan with his prior testimony at Jenkins's hearing – where Officer Egan took the position that Jenkins owned the drugs. In January 2020, Scott moved to withdraw from his representation of Adams because Keel intended to move for an evidentiary hearing at which Keel would call Scott as a witness. Keel filed that motion the following month, asserting that information gained through a proffer[4] further conflicted Scott and required an evidentiary hearing.

The district court denied the motions for a new trial and an evidentiary hearing, concluding that the difference in theories at Jenkins's and Adams's hearings failed to create a conflict of interest for Scott. The district court concluded that Jenkins's supervised release violations concerned whether "Jenkins was [in Adams's house] and involved with people who were engaged in illegal activities," not whether "he had the drugs." R.153, 2568-69. It further understood Officer

---

[4] The motion did not identify what that proffer was. Further, although the motion contended Adams made the proffer, Adams's brief on appeal contends Jenkins made the proffer. Whether Adams or Jenkins made the proffer is immaterial to our decision.

Egan's testimony in the two proceedings to be "responding to different kinds of questions" and not "inconsistent." *Id.* The district court did not address Adams's argument concerning the proffer.

The district court then sentenced Adams to 120 months on Count 1; 48 months on Counts 2, 3, 5, 6, and 7, concurrent to Count 1; and 60 months on Count 4, consecutive to all other counts. Adams timely appealed.

## II.

We first address the denial of Adams's motion for a new trial premised on an alleged conflict of interest. We review de novo the district court's legal conclusion that no conflict of interest existed. *United States v. Osborne*, 402 F.3d 626, 630 (6th Cir. 2005). "The underlying factual bases upon which the district court's conclusions rest are reviewed for clear error." *Id.*

In determining whether Scott's representation deprived Adams of his Sixth Amendment rights, the appropriate analytical framework depends on the type of representation involved: successive representation or multiple concurrent representation. Successive representation—*i.e.*, "previous unrelated representation of a co-defendant and/or trial witness"—calls for application of the ineffective assistance of counsel standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Lordi v. Ishee*, 384 F.3d 189, 193 (6th Cir. 2004).[5] *Strickland* demands proof of deficient performance (as measured against an objective standard of reasonableness) and prejudice (defined as a reasonable probability that, but for the deficiency, the result of the proceeding would have been different). *Strickland*, 466 U.S. at 688, 694. But with multiple concurrent

---

[5]     Although the Supreme Court has "explicitly left open the question of whether the [*Cuyler v. Sullivan*, 446 U.S. 335 (1980)] standard applie[s] to a conflict of interest due to successive representation," *Stewart v. Wolfenbarger*, 468 F.3d 338, 350-51 (6th Cir. 2006), we have held that it does not apply, *Lordi*, 384 F.3d at 193.

representation—*i.e.*, "a single attorney simultaneously represent[ing] two or more codefendants in the same or separate proceeding(s)," *Jalowiec v. Bradshaw*, 657 F.3d 293, 315 (6th Cir. 2011)—we apply the standard set forth in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), which permits us to presume *Strickland* prejudice where "counsel is burdened by an actual conflict of interest." *Stewart v. Wolfenbarger*, 468 F.3d 338, 350 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 692). An "actual conflict of interest" exists if "counsel 'actively represented conflicting interests'" and it "adversely affected [the] lawyer's performance." *Id.* (quoting *Strickland*, 466 U.S. at 692).

Adams briefs this issue under the *Sullivan* standard. The government counters that this case involves successive representation and, therefore, *Strickland* applies. We need not determine the appropriate standard, however, because Adams's claim fails under either standard. Adams has not demonstrated that Scott was burdened by an actual conflict of interest that affected his performance. *See, e.g.*, *Harvey v. United States*, 798 F. App'x 879, 884 (6th Cir. 2020) (skipping the representation analysis because defendant failed to meet the *Sullivan* standard, which he urged the court to apply). Nor has Adams shown prejudice under *Strickland*.

"In order to demonstrate a conflict of interest under *Sullivan*, [Adams] 'must point to specific instances in the record that suggest an actual conflict or impairment of [his] interests.'" *Moss v. United States*, 323 F.3d 445, 463 (6th Cir. 2003) (quoting *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987)). The conflict cannot relate to "a matter that is irrelevant" nor can it be "merely hypothetical." *Id.* at 464. Adams concludes that Scott was conflicted based on the government's assertion, at Jenkins's violation-of-supervised-release hearing, that Jenkins "was in possession of" the drugs "because he was in the basement where the items were found." September 12, 2017 Hearing Tr. at 38, *United States v. Jenkins*, No. 04-80033 (E.D. Mich. Sept. 12, 2017), ECF 102. But the district court presiding at Jenkins's hearing rejected the government's argument that

Jenkins possessed the drugs, finding there was not "enough evidence even by hearsay." *Id.* at 38-39. Further, Scott's defense strategy at Jenkins's hearing was predicated on "no one with any credibility [being able to] place Mr. Jenkins at" Adams's house and was not directly related to drug possession. *Id.* at 36. And, importantly, Scott's defense of Adams contradicted his defense of Jenkins—at Adams's trial, Scott elicited testimony that Jenkins was in Adams's basement and that Jenkins evaded law enforcement, whose search was flawed and whose investigation targeted Adams without looking at other suspects. Thus, it is clear that Scott did not feel bound to his prior position in his defense of Adams.

But even assuming there was a conflict of interest, Adams still fails to show that it had an adverse effect on Scott's representation of him. Showing an adverse effect requires demonstrating "that 'counsel was influenced in his basic strategic decisions by the interests of the former client.'" *Moss*, 323 F.3d at 466 (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988) (brackets omitted)). Adams points to three strategic decisions. First, Adams contends that Scott should have objected to the government's questioning to the extent it implied that Jenkins was not at Adams's house. But Adams does not tell us on what bases Scott should have objected. Further, Scott did not let the testimony on this point go unchallenged. Scott's questioning exposed law enforcement as not carefully setting a perimeter, not knowing whether someone left the house, and not immediately locating Jenkins after learning that Jenkins was in the basement when the search began. Second, Adams asserts that Scott failed to consider Jenkins as a potential defense witness. Yet it is purely speculative to suggest that Jenkins's testimony would have been helpful to Adams. *United States v. Kilpatrick*, 798 F.3d 365, 376 (6th Cir. 2015) (representation not adversely affected if not clear that counsel "failed to do something that was clearly advantageous"). There is nothing to suggest that Jenkins would have admitted to possessing the drugs (assuming he would

have waived his Fifth Amendment right against self-incrimination, which we have no reason to believe) or otherwise deflected suspicion from Adams. Third, Adams argues that Scott failed to "fully argue" that the drugs belonged to Jenkins. Appellant Br. at 20. But Scott pursued this theory throughout the case. In his opening statement, Scott advised the jury that some people in Adams's house got away but that law enforcement never wavered from the belief that the drugs belonged to Adams; on cross examination, Scott questioned several officers about Jenkins's involvement; after the government rested, Scott moved to dismiss a count due, in part, to Jenkins's presence in the basement; and, in closing, Scott argued that Jenkins was the true owner of the drugs.

In the absence of an actual conflict or its adverse effect on Scott's representation, Adams has not made a sufficient showing under *Sullivan*. This failure precludes the court from presuming *Strickland* prejudice; and because Adams presents no separate *Strickland* argument, he fails to meet that test as well. Accordingly, the district court properly denied Adams's motion for a new trial.

### III.

We turn to Adams's motion for an evidentiary hearing on his motion for a new trial. A district court's denial of an evidentiary hearing on a motion for a new trial is reviewed for abuse of discretion. *United States v. Bass*, 460 F.3d 830, 838 (6th Cir. 2006). The district court denied Adams an evidentiary hearing because, in its view, Officer Egan's testimony at Adams's trial was consistent with his testimony at Jenkins's hearing. Adams argues that the district court ignored another reason why Adams deserved a hearing: the need to elucidate what Scott learned in a proffer session.

With respect to the district court's expressed reason for denying Adams a hearing, we agree that Officer Egan's testimony was consistent. At Jenkins's hearing, although the prosecution

argued that Jenkins owned the drugs, Officer Egan testified only on the issue whether Jenkins was at Adams's house and involved with people engaged in illegal activities; no question to Officer Egan concerned ownership or possession of the drugs. By contrast, at Adams's trial, Scott questioned Officer Egan directly about why he believed the drugs belonged to Adams despite never seeing them in Adams's possession.

Adams's proffer argument is also insufficient to necessitate a hearing. Adams suggests that the information Scott gained led him to "avoid[] issues of Jenkins when the government belittled any efforts to show that Jenkins had fled the scene just before the search." Appellant Br. at 22. But Scott did not "avoid" Jenkins's involvement. Rather, he actively cast Jenkins as the owner of the drugs, who got away due to law enforcement's failures to secure the perimeter, make sure no one exited Adams's house unnoticed, or "try to locate" Jenkins after learning that Jenkins was in Adams's basement. R.85 PID 880.

The assertion that Scott withheld or handicapped a defense of Adams premised on Officer Egan's testimony or Jenkins's involvement is not borne out by the record. The district court did not abuse its discretion in denying Adams an evidentiary hearing. *United States v. Robinson*, 290 F. App'x 769, 776 (6th Cir. 2008) (per curiam) ("Because we conclude that [the] district court properly concluded that none of Robinson's grounds for a new trial have merit, he is not entitled to an evidentiary hearing.").

## IV.

For these reasons, we **AFFIRM** the district court's denial of Adams's motions for a new trial and for an evidentiary hearing.